WECHT, J.
On Friday afternoon, February 2, 2018, Legislative Respondents ("Applicants") filed an Application seeking my recusal in *1083 this matter, which Intervenor Republican voters have joined. On Monday morning, February 5, 2018, Petitioners and Executive Respondents in the instant case (collectively, "Opponents") responded to the Application via three separate answers: one submitted by Petitioners ("Petitioners' Answer"); one submitted by Governor Thomas W. Wolf, Acting Secretary of State Robert Torres, and Elections Commissioner Jonathan Marks ("Governor's Answer"); and one submitted by Lieutenant Governor Michael J. Stack, III ("Lieutenant Governor's Answer") (collectively, the "Answers").[1]
A motion for disqualification is directed to and decided by the jurist whose impartiality is questioned. Commonwealth v. Travaglia, 541 Pa. 108, 661 A.2d 352, 370 (1995). The applicable standard of review for a motion seeking a jurist's recusal is as follows:
In disposing of a recusal request, a jurist must first make a conscientious determination of his or her ability to assess the case before the court in an impartial manner, free of personal bias or interest in the outcome. "This is a personal and unreviewable decision that only the jurist can make." Goodheart v. Casey, 523 Pa. 188, 565 A.2d 757, 764 (1989). Once satisfied with that self-examination, the jurist must then consider whether or not continued involvement in the case would tend to undermine public confidence in the judiciary. Id. In reviewing a denial of a disqualification motion, we "recognize that our judges are honorable, fair and competent. Once the decision is made, it is final.... Reilly by Reilly v. SEPTA, 507 Pa. 204, 489 A.2d 1291, 1300 (1985).
Travaglia, 661 A.2d at 370 (citations modified). Recusal is not to be granted lightly, lest a jurist abdicate his "responsibility to decide." Pa. Code of Judicial Conduct Rule 2.11(A) (hereinafter the Pa.C.J.C. or the "Code").
As Applicants note, the Code, Rule 2.11(A), provides that I must disqualify myself "in any proceeding in which [my] impartiality might reasonably be questioned." I may decide that this is the case when, while a candidate for judicial office, I "made a public statement... that commit[ted me] to reach a particular result or rule in a particular way in the proceeding or controversy." Id. 2.11(A)(5). I must not make "pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office" with respect to "cases, controversies or issues that are likely to come before the court." Id. 4.1(A)(12). Countervailing, "[u]nwarranted disqualification or recusal may bring public disfavor to the court and to the judge personally." Id. 2.7, cmt. 1 ("Responsibility to Decide)." Furthermore, the Preamble to the Code notes that it is not "intended to be the basis for litigants to seek collateral remedies against each other or to gain tactical advantages in proceedings before a court." Id. Preamble ¶ 7.
Applicants have excerpted several statements from hundreds of appearances that I made across Pennsylvania while campaigning for a seat on this Court in 2015. While a judicial candidate, I responded to many questions regarding my positions on subjects of interest to the voters of this Commonwealth, and I accordingly expressed my views on a broad range of legal issues. These issues included the lawfulness of partisan gerrymandering.
*1084 Specifically, Applicants submit that my "position regarding the 2011 Plan, and, more generally, partisan map[-]drawing were clearly defined and cemented long before this case was initiated." Application at 6. They then excerpt a handful of comments made during my campaign for this office, including that "gerrymandering is an absolute abomination," "a travesty," "insane," and "deeply wrong." Id. at 6-7. I mentioned the thirteen-to-five split in favor of Republican representatives in Pennsylvania's House delegation against the background of a Democratic advantage in voter representation. Id. at 6. I further opined that "[e]xtreme gerrymandering is ... antithetical to the concept of one person, one vote." Id. at 7. These comments expressed my thoughts on the topic, something manifestly distinct from a clear commitment to rule in a certain way if presented with a specific challenge based upon a well-developed factual record and the benefit of full and fair advocacy.
Applicants' own chosen quotations also reveal a degree of equivocation and reserve on my part that defies their strongly-worded characterization of my putative prejudice on the particular questions that this case presents, which then were neither before the Court nor, to my knowledge, publicly anticipated. For example, in one instance in which I referred to the thirteen-to-five split, I elaborated as follows:
I'm not trying to be partisan, but I have to answer your question, frankly-. We have more than a million more Democrats in Pennsylvania, we have a state senate and state house that are overwhelmingly Republican. You cannot explain this without partisan gerrymandering. So I don't have a philosophy other than fidelity to our Constitution, and fidelity to our Constitution does not include drawing lines down the middle of streets or separating neighbors from one another. It doesn't include carving up municipalities. Our Constitution and its jurisprudence say that we ... are not supposed to divide up municipalities except where absolutely necessary. We are supposed to have ... compact and contiguous districts. And I challenge anybody to look at the map of our districts and deem them to be compact and contiguous.
Id. at 7-8. On another occasion, I made clear that my thoughts on the matter were distinct from how I might rule on a hypothetical challenge:
Right nearby here, by way of just one example, Montgomery County, a county or two over here, is represented in pieces by I think 5 different members of Congress. That's unbelievable. So I don't know and I can't tell you what the map would be, and it's not for me to say, and I don't know how I would rule on any given map. But I can tell you the Constitution says "one person, one vote," and it does not allow for unconstitutional gerrymandering.
Id. at 9. While Applicants find that these comments in 2015 reinforce their claim that I committed myself to a specific position in this specific case being litigated now in 2018, I find in them the circumspection warranted of a candidate for judicial office endeavoring to inform voters of my views without committing to a particular result in any given case.
Opponents to the Application have filed three separate Answers. The Answers focus in large part upon the untimeliness of Applicants' challenge, Applicants' allegedly misleading quotations of the statements at issue, and the propriety of those statements when viewed in context.
Petitioners argue that Applicants knew or should have known of the statements underlying their challenge long before *1085 Applicants sought my disqualification, and, thus, have waived the issue by failing to seek my disqualification at the earliest opportunity. Petitioners' Answer at 4 (quoting Lomas v. Kravitz, --- Pa. ----, 170 A.3d 380, 390 (2017) ; Goodheart v. Casey, 523 Pa. 188, 565 A.2d 757, 764 (1989) ). They note that courts are particularly wary of attempts to seek disqualification of a judge after judgment has been entered. Id. at 5 (citing Goodheart, 565 A.2d at 763 ; Reilly by Reilly v. SEPTA, 330 Pa.Super. 420, 479 A.2d 973, 988 (1984) ). They also argue that Applicants should have known the facts upon which they rely, at a minimum, months before they filed the instant application. Independent of the untimeliness of the application, Petitioners maintain that my campaign statements were entirely appropriate, in that judicial candidates are authorized and encouraged to comment upon legal issues. Id. at 10 (citing, inter alia, Pa.C.J.C. 4.1, cmt. 9 (stating that judicial candidates' "announcements of personal views on legal, political, or other issues ... are not prohibited") ).
Governor Wolf similarly argues that the statements at issue comported with Pennsylvania's Code of Judicial Conduct, amounted to nothing more than responses to general questions from the public, and did not constitute any pledge to rule in a particular way in any case. See Governor's Answer at 13. The Governor notes that the Pennsylvania Constitution requires partisan elections of Supreme Court Justices, which necessarily means that judicial candidates are expected to provide public statements regarding issues of concern to voters. The Code recognizes this, and allows for judicial candidates to "respond to media and other inquiries," subject to the guidance that candidates should "give assurances that they will keep an open mind" and must refrain from making any "pledges, promises, or commitments that are inconsistent with the impartial performance of judicial duties. Id. at 14 (quoting Pa.C.J.C. 4.1(A)(12), cmt. 11). Governor Wolf notes that, at the time that I made the statements at issue in 2015, there was no pending case involving Pennsylvania's congressional districting plan, and I offered no opinion as to the validity of that plan, the existence of a judicially manageable standard for assessing that plan, nor the quality or quantity of evidence that would be necessary to adjudicate any such future question. Id.
Lieutenant Governor Stack stresses the untimeliness of the Application, arguing that Applicants are sophisticated parties who should have been aware of publicly available information about my campaign and that, in any event, the Application reveals that Applicants discovered the statements at issue from publicly available sources over the course of three days, but declined to act until after receiving an adverse judgment. Lieutenant Governor's Brief at 11-12. He also argues in detail that my statements did not violate the Code. Id. at 15-16.
Importantly, all three Answers stress that Applicants have omitted portions of my statements, removing critical context and creating an intentionally misleading impression as to their content and meaning. See, e.g., Petitioners' Answer at 11-14; Governor's Answer at 4-12; Lieutenant Governor's Answer at 5-7, 18. As Governor Wolf explains, Applicants repeatedly "cut out those portions of [my] quotations that made clear [that I] was in fact discussing state legislative redistricting and the Supreme Court's non-judicial role in it." Governor's Answer at 4 (emphasis in original). "Perhaps more egregiously," id., Governor Wolf notes, the Application redacts numerous portions of the quotations in which I stated that I remain open-minded on the issues, offered no opinion on the lawfulness *1086 of any particular districting plan or map-drawing process, and clarified that I will decide each case based upon the law and the facts. All Answers suggest that Applicants have redacted my statements deliberately to create a false impression of their contents and to cast unjustified doubt upon my integrity and impartiality.
Throughout these proceedings, time has been of the essence. This is reflected in the alacrity with which, upon order of this Court, the Commonwealth Court and the parties prepared and conducted a robust, tremendously complex trial mere weeks after our order directing same; the Commonwealth Court issued painstaking, detailed Findings of Fact and Conclusions of Law approximately two weeks after its completion; and, on a challenging schedule, the parties prepared excellent, informative briefs on appeal to this Court, and prepared and delivered exemplary arguments on the issues presented-all of this to enable a timely decision that preserves the 2018 primary and general election as scheduled, while ensuring that Pennsylvanians go to the polls confident that their respective districts fairly reflect their and their community's interests and that their votes will not be marginalized by partisan maneuverings.
The lone exception to this breakneck pace is the timing of this Application, and that fact alone compels my decision to deny Applicants' request. This Court very recently has articulated and reaffirmed the well-settled standard governing the timeliness of such applications. "The case law in this Commonwealth is clear and of long standing; it requires a party seeking recusal or disqualification to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." Lomas, 170 A.3d at 389 (quoting Goodheart v. Casey, 523 Pa. 188, 565 A.2d 757, 763 (1989) ). The timeliness of such an application is particularly troubling where a party seeks disqualification only after receiving an adverse judgment. See Reilly, 489 A.2d at 1300 ("Once the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result.").[2]
Litigants cannot be permitted to hedge against the possibility of losing a case on the merits by delaying the production of arguable grounds for disqualification, or, worse, by digging up such grounds only after learning of an adverse order. To hold otherwise would encourage judge-shopping, would undermine the interests in the finality of judicial decisions, and would countenance extensive and unnecessary expenditures of judicial resources, which are avoidable by mere timely advancement of the challenge. The courts of this Commonwealth cannot and do not approve of such gamesmanship. Indeed, the Preamble to the Code expressly cautions that it is not "intended to be the basis for litigants ... to obtain tactical advantages in proceedings before a court." Pa.C.J.C. Preamble ¶ 7. To foreclose this improper tactical maneuvering as it relates to applications for disqualification, "the law is clear" that "a party must seek recusal of a jurist at the earliest possible moment, i.e., when the party knows of the facts that form the basis for a motion to recuse."
*1087 Lomas, 170 A.3d at 390. Notably, this Court has held that, in addition to actual knowledge of the facts underlying the application, facts that "should have been known" are to be considered in determining timeliness. See Goodheart, 565 A.2d at 764. Further, where an application for disqualification is based upon facts purportedly discovered after judgment has been rendered, this Court has held that, "as in other cases involving after discovered evidence, there must be a showing that... the evidence could not have been brought to the attention of the ... court in the exercise of due diligence." Reilly, 489 A.2d at 1301.
Herein, Applicants have based their challenge to the propriety of my participation in the instant case upon campaign rhetoric that has been in the public domain for well over two years. Their evidence consists of media reports and YouTube videos that have been freely accessible to any user of the Internet since 2015. Applicants do not suggest that they were unable to discover the statements at issue, or otherwise were precluded from bringing them to the Court's attention, at some point before this Court assumed extraordinary jurisdiction on November 9, 2017, before the commencement of trial on December 11, 2017, before the submission of their brief on January 10, 2018, before the presentation of oral argument on January 17, 2018, before this Court issued its dispositive order on January 22, 2018, or before the Court issued its most recent order on January 26, 2018. Instead, Applicants aver that they learned the facts that form the basis of their application only after oral argument on January 17, 2018. The impetus for their late investigation, Applicants aver, was what they now characterize as my "adversarial tone" at the oral argument session. Application at 16.
Applicants' argument is belied by their application. In support of their contention that the application is timely, Applicants have appended an affidavit from counsel's "Senior Litigation Support Coordinator," who attests to the dates and manner by which he discovered the statements at issue herein. According to the affidavit, he discovered each statement through Internet searches conducted on January 31, 2018 and February 2, 2018. February 2, 2018, is also the date upon which the instant application was filed. Not only does this affidavit demonstrate that Applicants were able to discover the statements and to draft the application in three days, but it also establishes, on its face, that Applicants did not even commence their investigation into the matter until two weeks after the date upon which, they aver, they developed cause to do so. In those intervening two weeks, this Court issued its order ruling against Applicants on January 22, 2018, and issued a corresponding order on January 26, 2018. Applicants fail to explain why, after being so troubled by my questions at oral argument, they declined to conduct their investigation immediately, rather than waiting until after this Court had rendered its decision.
Applicants may not rely upon disqualification to obtain a retroactive victory in this litigation. Because Applicants have brought this matter to my attention only after receiving an adverse order, because the facts that form the basis of their challenge were known or should have been known to them at an earlier date, and because Applicants have not advanced their claim at the earliest possible opportunity, their application is untimely as a matter of Pennsylvania law.
Applicants also seek to excuse their delay by transferring to me exclusive responsibility for their own purported ignorance of the contents of my campaign rhetoric.
*1088 See Application at 16 ("Justice[ ] Wecht... failed to disclose [his] prior statements and beliefs in violation of their affirmative duty to do so established by [Pa.C.J.C. 2.11(A) ]."). Applicants' argument is unpersuasive. First, and as discussed below, my statements taken in their proper context, while vigorously worded, were not improper and would not warrant my recusal regardless of the Application's untimeliness. Second, I reject Applicants' suggestion that I can recall with perfect detail the substance and tenor of comments that I made on the statewide campaign trail well over two years ago, comments cherry-picked and curated from among thousands of statements that I made over the course of that dizzying and unprecedented campaign. While I appreciate Applicants' generous assumption regarding my mental acuity, I must admit that the details of every such statement do not remain at the forefront of my memory, my focus, and my attention day-to-day. Third, this Court's case law does not support the notion that, simply because, arguendo, I should have disclosed these statements to Applicants (had I remembered them), Applicants may seek my disqualification now, only after they have received an adverse judgement. See Reilly, 489 A.2d at 1301 ("[S]imply because a judge does not raise sua sponte the issue of his impartiality, however, does not entitle a party to question a judge's partiality after the case has ended without substantiation in the record that the complaining party did not receive a full, fair, and impartial trial"). Accordingly, Applicants' alternative suggestion regarding the timeliness of the Application is unavailing.
Setting aside waiver, it is worth acknowledging the tension that the Supreme Court of the United States has highlighted between the First Amendment rights of judicial candidates to speak freely and the need to maintain the fact and appearance of their impartiality once in office. In Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), a case that Applicants fail to discuss or even acknowledge in their Application, the High Court considered Minnesota's "announce clause," a rule that precluded a candidate for judicial office from "announc[ing] his or her views on disputed legal or political issues." Id. at 768, 122 S.Ct. 2528. The Court ruled that the announce clause, because it proposed to restrict political speech based upon its content, was subject to strict scrutiny. Thus, to prevail, defenders of the announce clause were required to demonstrate that it was narrowly tailored to serve a compelling state interest. The clause failed that stringent standard.
The Court focused upon the several meanings one might assign to the word "impartial." First was a "lack of bias for or against either party to the proceeding." Id. at 775, 122 S.Ct. 2528. The Court found this sense of the word had no bearing on the rule, which pertained by its terms to legal and political issues. The second sense of the word was "lack of preconception in favor of or against a particular legal view." Id. at 776, 122 S.Ct. 2528. This, the Court explained, "would be concerned, not with guaranteeing litigants equal application of the law, but rather with guaranteeing them an equal chance to persuade the court on the legal points in their case." Id. at 777, 122 S.Ct. 2528. The court found that the announce clause might serve this interest, but that the interest was not compelling.
A judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law.... Indeed, even if it were possible *1089 to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so. Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.... And since avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the "appearance" of that type of impartiality can hardly be a compelling state interest either.
Id. at 777-78, 122 S.Ct. 2528 (citations and quotation marks omitted). In short, requiring a judicial candidate to feign indifference to the legal issues of the day would, in itself, be both dishonest and disqualifying in the eyes of a thoughtful voter.
The third and final sense of impartiality "might be described as open-mindedness." Id. at 778, 122 S.Ct. 2528. "This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case." Id. This would seek to ensure only that each litigant have "some chance" to win, not necessarily an "equal chance." Id. (emphasis in original). Although this might be desirable, the High Court did not believe that it was the intended purpose of the announce rule. The Court noted that campaign trail statements are "an infinitesimal" portion of most judges' public commitments to legal positions. The Court cited as examples Justice Black's participation in decisions considering the constitutionality of the Fair Labor Standards Act, which he helped author as a Senator, and Chief Justice Hughes' authorship of a Court opinion overruling a case he had criticized in a book he wrote before his appointment. Setting aside these and the expression of opinions on the bench-and I have expressed a great many, like most of my peers at all levels of the judiciary-the Court cited classes conducted and books and speeches as more pedestrian outlets for such opinions. Minnesota's own Code of Judicial Conduct specifically acknowledged that "[a] judge may write, lecture, teach, speak and participate in other extra-judicial activities concerning the law." Id. at 779, 122 S.Ct. 2528. It would be a tall order indeed for the average judge to do any or all of these things, and to hold an audience's attention in the process, while refraining from at least suggesting views and beliefs regarding any number of issues likely to come before a court of general jurisdiction.
The Supreme Court then addressed the incongruity between the announce clause and a realistic account of the long, winding road most jurists travel to the bench. Under the clause, a candidate could not declare that he thought it unconstitutional to prohibit same-sex marriages, but he could have done so in a public forum mere moments before declaring his candidacy without bearing upon his impending candidacy. Thus, the open-mindedness account of the word "impartial" rendered the clause unconstitutionally vague-"so woefully underinclusive as to render belief in that purpose a challenge to the credulous." Id. at 780, 122 S.Ct. 2528.
The Court then turned to consider the concern that lay at the heart of Minnesota's prohibition of robust commentary on legal issues on the campaign trail-that a judge who articulated a strong opinion on a legal topic during a campaign would feel duty-bound to rule consistently with that position in future cases. The Court did not dispute that a judge might perceive some pressure to do so, but emphasized that an elected judge always faces the prospect that a given ruling will move the electorate *1090 to vote against him in a future election, regardless of whether he spoke on the subject during his campaign. By way of example, the Court colorfully observed that "[s]urely the judge who frees Timothy McVeigh places his job much more at risk than the judge who (horror of horrors!) reconsiders his previously announced view on a disputed legal issue." Id. at 782, 122 S.Ct. 2528. Every day of a jurist's life is rife with opportunities to offend one constituency or another, including constituencies that have supported a jurist in past elections. This opportunity (and not infrequent duty) to offend is what we sign up for.
The White Court concluded:
There is an obvious tension between the article of Minnesota's popularly approved Constitution which provides that judges shall be elected, and the Minnesota Supreme Court's announce clause which places most subjects of interest to the voters off limits.... The disparity is perhaps unsurprising, since the [American Bar Association], which originated the announce clause, has long been an opponent of judicial elections .... That opposition may be well taken ..., but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about.
Id. at 787-88, 122 S.Ct. 2528 ; cf. id. at 794, 122 S.Ct. 2528 (Kennedy, J., concurring) ("What Minnesota may not do ... is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State. The law in question here contradicts the principle that unabridged speech is the foundation of political freedom." (citation omitted) ). Justice O'Connor perhaps said it best:
Minnesota has chosen to select its judges through contested popular elections instead of through an appointment system or a combined appointment and retention election system .... In doing so, the State has voluntarily taken on the risks to judicial bias .... If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.
Id. at 792, 122 S.Ct. 2528 (O'Connor, J., concurring).
My research has disclosed only one case in which the principles articulated in White have been brought squarely to bear on the question of recusal, and its ruling reflected the concern stated above. In Duwe v. Alexander, 490 F.Supp.2d 968 (W.D. Wis. 2007), the District Court faced a facial challenge by Wisconsin Right to Life ("WRL") to various judicial canons that, WRL maintained, unconstitutionally interfered with their right to solicit answers to their judicial candidate survey. Among the challenged canons was Wisconsin Supreme Court Rule 60.04(4)(f), which, much like White's announce clause, would require a judge to recuse in a case presenting a legal issue when, as a candidate, the judge "made a public statement that commits, or appears to commit" the judge with respect to "an issue in the proceeding." Duwe, 490 F.Supp.2d at 977. The district court found that the phrase "appears to commit" had the effect of requiring recusal in any case where a judge previously announced a position on an issue in the case, which rendered it overbroad and vague-and materially indistinguishable in effect from the clause rejected in White. The court rejected the argument that the principles and concerns at issue in White had no bearing because the clause concerned recusal once in office, rather than constituting prior restraint during a campaign:
*1091 While it is true that the recusal requirement is not a direct regulation of speech, the chilling effect on judicial candidates is likely to be the same. Although a candidate would not fear immediate repercussions from the speech, the candidate would be equally dissuaded from speaking by the knowledge that recusal would be mandated in any case raising an issue on which he or she announced a position.
Duwe, 490 F.Supp.2d at 977.
None of this is to suggest that the Court's decision in White has conclusive constitutional effect with regard to the rules I am asked to honor by recusing in this particular case, and certainly no United States District Court decision binds us. See In re Stevenson, 615 Pa. 50, 40 A.3d 1212, 1221 (2012). Our Code did not directly limit my First Amendment right to speak during the campaign; rather, it assigned certain consequences to my exercise of that freedom. Furthermore, as I was a sitting Superior Court judge during that campaign, I could be expected to recognize the risk that the more strongly I articulated my informed thoughts on the state of the law with respect to certain issues, the more likely I was to have my own comments stated back to me as evidence of bias and a basis for disqualification.
My campaign rhetoric concerning redistricting indisputably was sometimes ardent. Furthermore, I did not always qualify my statements to clarify that I would view each case on its individual merits, subject to the particular laws implicated, the particular arguments presented, and the particular factual record the parties developed-in this case at tremendous expense in time and treasure-although I did so more frequently than Applicants allow. However, my comments must be taken in context and in sum.[3] Applicants' own collection of my comments deploring gerrymandering as violative of the principle of "one person, one vote" include two instances in which I aptly and sincerely qualified my opinion on the subject by noting that there was no impending case on the matter, and that I would be bound to judge any such case on its merits should occasion arise. Application at 4-5. Like most judges, I have spent the better part of my professional life advocating, interpreting, and applying Pennsylvania law. I have held forth at length on more topics than I can remember, and in all instances have done so out of love and respect for our Constitution. While I have worn the robe, I have, to the best of my ability, unerringly applied the law as I perceive it without allowing personal predilections to eclipse principled analysis.
It is true that, like many jurists[4] and citizens, I long have been concerned about extreme partisan gerrymandering, and I have said so. As a matter of jurisprudential *1092 principle, it matters not a whit to me whether a gerrymandered map favors Democrats or Republicans. A gerrymandered map is a gerrymandered map. Any distortion of the electoral process for political gain poses a threat to the promise of representative democracy. If a representative body is not fairly representative of all the people in equal measure, then that promise has not been kept.
Finally, Applicants' assertion that my disqualification is required as "a matter of due process," Application at 12, is unsupported by the jurisprudence of the Supreme Court of the United States. The High Court has repeatedly held that "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) ; see Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ("All questions of judicial qualification may not involve constitutional validity."). The circumstances raised in the instant application are wholly unlike those narrow situations in which the United States Supreme Court has held that recusal was mandated as a matter of due process. I had no personal involvement in the litigation and did not represent any party in this or any related case. See Williams v. Pennsylvania, --- U.S. ----, 136 S.Ct. 1899, 195 L.Ed.2d 132 (2016). I have no pecuniary interest in the outcome of the litigation. See Aetna Life Ins. ; Tumey . Plainly, a jurist holding views regarding legal issues-the avoidance of which, White explained, is neither possible nor desirable-does not create the same risk of bias in the administration of justice.
It is, indeed, imperative that my every action must be tailored to protect this august Court from the appearance of impropriety; that I must not allow my conduct to undermine public confidence in the judiciary. Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 534 (2003) (quoting Commonwealth v. Abu-Jamal, 553 Pa. 485, 720 A.2d 79, 89 (1998) ). That being said, given the publicity surrounding this case and its consequence, it is as or more likely that the reversal of such a prominent case after a flurry of state and national media coverage will call into question this Court's orderly administration of justice, as will be my decision not to recuse.
After a great deal of reflection, I have decided to deny the Application. The reasons are several: Applicants' delay in seeking my recusal, and particularly the fact that, by their own account, they did not even begin to mine the public record in search of a basis to do so until two weeks after they claim they were moved to do so and nine days after they received an adverse ruling; the contemporaneous qualifications I offered in connection with my 2015 comments on gerrymandering; the principles articulated in the United States Supreme Court's decision in White ; and my own certainty that I have evaluated this case strictly on the facts and the law without regard to a handful of statements I made among thousands expressed on the 2015 campaign trail, which were offered only to present voters with a sincere, transparent account of the thoughts that had informed my work as an appellate jurist. For all of these reasons, and confident in my determination to judge each case on its individual merits, I decline to disqualify myself from these proceedings.
AND NOW , this 5th day of February, 2018, the February 2, 2018 Application of Respondents for Disqualification of Justice David Wecht and for Full Disclosure by Justice Christine Donohue is denied, to the extent it seeks the undersigned Justice's disqualification.

While Governor Wolf and Lieutenant Governor Stack are named respondents in this matter, they have adopted and defended Petitioners' position that Pennsylvania's congressional districts are unconstitutionally gerrymandered throughout this litigation.

See also Goodheart, 565 A.2d at 763 (quoting a litigant's argument that the moving party "chose to remain silent, resorting to the unconscionable and reprehensible tactic of I[y]ing in the grass, waiting until the decision and then raising the disqualification issue only if they lost," and noting, "[w]e cannot say that this characterization, although somewhat florid, is either inaccurate or unfair").

Cf. Ex parte Ellis, 275 S.W.3d 109, 116 (Tex. App. 2008) (holding that "the proper inquiry [in considering the necessity of recusal] is "whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial," and underscoring that "the determination should be made based on a studied analysis of all of the circumstances involved rather than a knee-jerk reaction to one fact in isolation").

See, e.g., Vieth v. Jubelirer, 541 U.S. 267, 345, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Souter, J., dissenting) ("[T]he increasing efficiency of partisan redistricting has damaged the democratic process to a degree that our predecessors only began to imagine."); id. at 355, 124 S.Ct. 1769 (2004) (Breyer, J., dissenting) ("Sometimes purely political 'gerrymandering' will fail to advance any plausible democratic objective while simultaneously threatening serious democratic harm.").