**2023 WI 67**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2023AP1412-OA

STATE OF WISCONSIN          :          IN SUPREME COURT

Stephen Joseph Wright, Gary Krenz, Sarah J. Hamilton, Jean-Luc Thiffeault, Somesh Jha, Joanne Kane, and Leah Dudley,

       Petitioners,

   v.

Wisconsin Elections Commission; Don Millis, Robert F. Spindell, Jr., Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, Joseph J. Czarnezki, in their official capacities as Members of the Wisconsin Elections Commission; and Meagan Wolfe, in her official capacity as Administrator of the Wisconsin Elections Commission,

       Respondents.

**FILED**

**Oct. 6, 2023**

Samuel A. Christensen
Clerk of Supreme Court

**MEMORANDUM DECISION AND ORDER OF
JUSTICE JANET C. PROTASIEWICZ**

Before JANET C. PROTASIEWICZ, J.

¶1   On August 1, 2023, I swore a sacred oath to "faithfully and impartially discharge the duties of [my] office."[1]  In taking that oath, I promised——above all else——to decide cases based only on the rule of law, not my own personal opinions.  Each of my colleagues has taken the same oath.  We all strive to be fair and impartial in our work:  "We're people . . . .  We have opinions on the issues of the day.  Once we put the black robe on . . . we put those opinions aside."[2]

¶2   Here, individual Wisconsin citizens ask the court to hear an original action concerning the State's legislative districts.  The Wisconsin Legislature seeks to intervene and has asked me to recuse.[3]

---

[1] See Wis. Stat. § 757.02(1) (2021-22) (setting forth the oath of office for judges and justices).  All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

[2] Patrick Marley, Election 2016: Bradley, Kloppenburg Clash Again During Debate, Milwaukee J. Sentinel (Mar. 17, 2016) https://www.jsonline.com/story/news/politics/elections/2016/03/18/election-2016-bradley-kloppenburg-clash-again-during-debate/84898270 (quoting Rebecca G. Bradley).

[3] I refer to the movant as "the Legislature."

¶3 Recusal decisions are controlled by the law. They are not a matter of personal preference. If precedent requires it, I must recuse. But if precedent does not warrant recusal, my oath binds me to participate. As Justice Alito has emphasized: "When there is no sound reason for a Justice to recuse, the Justice has a duty to sit."[4] That is true even when a case is controversial, or when my decision may upset those who would rather I step aside. Respect for the law must always prevail. Allowing politics or pressure to sway my decision would betray my oath and destroy judicial independence. As Justice Prosser has warned, unjustified recusal can affect the integrity of the judicial branch: "Successful recusal motions alter the composition of the Wisconsin Supreme Court, so that, in a very real sense, a party moving for a justice's recusal is trying to change the composition of the court that will hear its case."[5]

¶4 Strict adherence to the law is especially important here. This recusal motion has been filed by a co-equal branch of government. I take its request seriously. I also appreciate that

---

[4] Moore v. United States, No. 22-800, at 1 (U.S. Sept. 8, 2023) (Statement of Alito, J.).

[5] See Appendix B, Justice David T. Prosser's Decision Accompanying Order Denying Mot. for Recusal, State ex rel. Three Unnamed Petitioners v. Peterson, Nos. 2013AP2504-08-W, at 9 (Wis. July 29, 2015).

this motion has engendered strong feelings in some quarters among people of good faith.

¶5 In deciding this motion, I have searched the law books——and my conscience——to ensure a correct and impartial ruling. I have reviewed the parties' arguments. I have studied the facts. And I have examined every relevant precedent. Ultimately, I have found I must deny the recusal motion. Before turning to my full analysis, I will summarize why I have reached that conclusion.

## I. SUMMARY

¶6 The Legislature first argues that I must recuse because the Democratic Party of Wisconsin (DPW) made substantial contributions to my campaign ($9.9 million) and would benefit if this court were to order the adoption of new maps. In the Legislature's view, due process prohibits me from hearing this case because a particular possible resolution may benefit a campaign donor.[6]

¶7 This claim lacks merit for two reasons. First, the Legislature has not cited——and I have not found——any case in which a judge recused because a political party that was not involved in the litigation had contributed to their campaign. To the contrary,

---

[6] The Legislature presses this argument in reliance on Caperton v. A.T. Massey Coal Company, Inc., 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009), which I discuss at greater length below.

judges of all political affiliations have denied such motions.[7] And justices of this court have repeatedly participated in redistricting cases despite receiving substantial support from politically affiliated groups during their campaigns. For example, no justice recused from Johnson v. Wisconsin Elections Commission, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559, even though many had received outsized partisan or ideological financial support during their latest campaigns.[8]

¶8 Here, the Legislature focuses on contributions that I received from the DPW. But the DPW is not a litigant and plays no role in this case. Rather, this original action petition has been filed by citizens who allege violations of their own individual rights. Those citizens, moreover, are not mere stand-ins for a political party. As voters, they claim to advance legal interests in excluding partisan influence of all kinds from the districting process. Taken at face value, those interests may, in some circumstances, contradict the interests of the DPW. Thus, for me

---

[7] See, e.g., Harper v. Hall, 867 S.E.2d 326 (N.C. 2022); Dickson v. Rucho, 735 S.E.2d 193 (N.C. 2012).

[8] See Derek Clinger & Robert Yablon, Explainer: Judicial Recusal in Wisconsin and Beyond, State Democracy Research Initiative, at 26-28 (Sept. 5, 2023), available at: https://uwmadison.app.box.com/s/k2bx0l2b9vwsgiqfl4sfoiwt8m3j43qc (discussing examples involving Justices Rebecca Grassl Bradley, Rebecca Frank Dallet, Brian Hagedorn, and Jill J. Karofsky).

to recuse myself based on campaign contributions from the DPW——a non-party to this case——would be unprecedented.

¶9 Accepting the Legislature's theory would also raise a swarm of continuing difficulties for each justice. In recent Wisconsin Supreme Court races, the victor has received substantial financial support from a single entity. In 2016, the Wisconsin Alliance for Reform spent $2.6 million supporting Justice Rebecca Grassl Bradley's campaign (comprising 46.2 percent of total spending in that election). In 2018, Greater Wisconsin Committee spent $940,000 supporting Justice Rebecca Frank Dallet's campaign (comprising 17 percent of total spending in that election). In 2019, the Republican State Leadership Committee spent $1.25 million supporting Justice Brian Hagedorn's campaign (comprising 15.2 percent of total spending in that election). In 2020, A Better Wisconsin Together Political Fund spent $1.88 million supporting Justice Jill J. Karofsky's campaign (comprising 18.8 percent of total spending in that election). And in 2023——where the total amount of money spent in support of both candidates obliterated historical records——the DPW spent $9.9 million supporting my campaign (still comprising only 19.4 percent of total spending in that election). This trend is likely to persist.[9]

---

[9] The facts in this paragraph are drawn from Clinger & Yablon, supra note 8, at 26-28.

¶10 It would be unworkable, and again unprecedented, to conclude that the Due Process Clause requires every elected judge to recuse whenever their involvement might be predicted (before they have even cast a vote) to benefit non-parties who supported their campaign. Indeed, this court would grind to a halt if that were the constitutional standard for recusal. We would be flooded with requests for "conservative" or "liberal" justices to recuse whenever a case involved issues of great social or political importance to any major campaign funder. See County of Dane v. Pub. Serv. Comm'n, 2022 WI 61, ¶91, 403 Wis. 2d 306, 976 N.W.2d 790 (Hagedorn, J., concurring) ("We have seen bias and recusal allegations increase greatly in recent years, turning the obligation of adjudicator impartiality into a litigation weapon."). In a system of elected judges, it is inevitable that outside groups and political parties will support candidates whose judicial philosophies are hoped to align with their own worldviews. When those groups participate in a case as litigants, recusal may well be warranted as a matter of good judgment (though it is not currently required by Wisconsin law).[10] Yet it would turn precedent on its head, and confound the administration of this court, for justices to recuse whenever a possible outcome of a case could

---

[10] See SCR 60.04(7).

7

potentially be seen as beneficial to a non-party campaign supporter.[11]

¶11 For that reason alone, the Legislature's argument based on campaign contributions cannot succeed. But there is a separate, second reason: under binding United States Supreme Court precedent, the nature and amount of the DPW's contribution comes nowhere close to requiring my recusal.

¶12 In this respect, the Legislature's position is foreclosed by Caperton v. A.T. Massey Coal Company, Inc., 556 U.S. 868 (2009). Caperton is the first and only decision of the United States Supreme Court to require judicial recusal based on campaign contributions. And the facts of that case were "exceptional." Id. at 884. While a case was pending against his company, a CEO spent $3 million promoting the election of a judge who won a spot on West Virginia's highest court by merely 50,000 votes——and who then cast the deciding vote to overturn a $50 million verdict against the CEO's company in that very same pending case. Id. at 873-76. The CEO's $3 million in donations, moreover, had totally

---

[11] In reaching this conclusion, I do not foreclose the possibility that Caperton could require an elected judge to recuse based on contributions from a non-party. But cases involving campaign contributions from a political party are an especially weak fit for that possibility. Indeed, many states have partisan judicial elections, and it has not been suggested that party-backed judges must recuse from all cases where the outcome could matter to their party.

flattened the field: it vastly exceeded the amount spent by all other supporters of the judge; it was more than three times the amount spent by the judge's own campaign committee; and it surpassed by $1 million the total amount spent by the campaign committees for both of the candidates combined. See id. at 873.

¶13 Caperton recognized that its rule would apply only in "rare instances." Id. at 890; see also id. at 887 ("The facts now before us are extreme by any measure."). Indeed, "nowhere in the Caperton decision does the Supreme Court state that any lesser fact situation would have required [the judge's] recusal in that case, and nowhere does the Supreme Court conclude that he would be required to recuse himself from an unrelated civil case that involved different parties." State v. Allen, 2010 WI 10, ¶269, 322 Wis. 2d 372, 778 N.W.2d 863 (Ziegler, J., concurring).

¶14 Here, as explained above, the Legislature seeks recusal in an "unrelated civil case that involve[s] different parties." Id. Moreover, this is obviously a "lesser factual situation." Id. In Caperton, the CEO spent 300 percent more than the judge's campaign committee; here, the DPW's contribution was only 57 percent of the spending by my campaign committee, and was merely 33 percent of the total spending in support of my campaign. In Caperton, the CEO's donations fully eclipsed all other spending in the election; here, the DPW's contribution was just 19 percent of all spending on the race. In Caperton, the CEO's expenditures

9

were concerning partly because his favored judge won by only 50,000 votes; here, I defeated Justice Kelly by a decisive 11 percent of the vote (the very same margin by which Justice Kelly lost to Justice Karofsky only three years earlier). And in Caperton, the CEO spent $3 million while his own case was already pending before the West Virginia courts; here, these original action petitions were filed months after the election had already concluded.

¶15 Under Caperton, these distinctions make all the difference. The DPW's contribution was too small a percentage of my campaign committee's fund, and too small a percentage of the overall spending on the race, to warrant my disqualification——especially given that the election was not close and this original action petition was not even pending at the time. While the total amount of the DPW's contribution was surely substantial, the 2023 election broke all historical records in Wisconsin. Compared to total election spending, it falls far short of Caperton's recusal standard.

¶16 This brings me to the Legislature's second argument: that the Due Process Clause of the United States Constitution requires recusal because, while campaigning, I described the legislative maps as "gerrymandered," "rigged," and "unfair," and I expressed disagreement with the Johnson case (which ordered the adoption of these maps). The Legislature views this as legally impermissible.

10

¶17 There are two fundamental issues with the Legislature's position. The first is factual. While making many of the statements that the Legislature spotlights, I also emphasized that these were descriptions of my personal "values," not pledges of "what I'm going to do on a particular case." Elsewhere, I explained: "I plan to follow the law. I tell you what my values are because I think that Supreme Court candidates should share with the community and the electorate what their values are. Nonetheless, I will uphold the law [and] follow the Constitution when I make any decisions. Nothing is prejudged." I also made clear: "[W]hat my real values are and what's going to happen in a case can be two different things, right? I mean, follow the law, you look at the case law, you look at the statutes, you look at the constitution, and you follow where . . . it leads you." And again: "I follow laws I don't always necessarily like or agree with. You follow the law."

¶18 These statements——and there are many of them——expressed my fundamental commitments as a judge. I will set aside my opinions and decide cases based on the law. There will surely be many cases in which I reach results that I personally dislike. That is what it means to be a judge. See Caperton, 556 U.S. at 891 (Roberts, C.J., dissenting) ("All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise.").

11

¶19 The second issue with the Legislature's position is that it is foreclosed by federal precedent. As two legal experts recently explained, "[n]o Supreme Court case has ever held that due process required a judge to recuse because of the judge's expression of views, whether on the campaign trail or elsewhere. In fact, the Court has rejected several such claims."[12] Thus, "[no] decision of the [United States Supreme] Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law." FTC v. Cement Inst., 333 U.S. 683, 702-03 (1948).

¶20 More recently, the United States Supreme Court struck down a Minnesota rule that banned judicial candidates from announcing their views on disputed legal or political issues. See Republican Party of Minn. v. White, 536 U.S. 765 (2002). Writing for the Court, Justice Antonin Scalia made clear that "[a] judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason." Id. at 777. "For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law." Id. Nor should anybody want to elect such a judge: "Proof that a Justice's mind at the time he joined the Court was

---

[12] Clinger & Yablon, supra note 8, at 10.

12

a [blank slate] in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." Id. at 778 (quoted source omitted). The truth is that "avoiding judicial preconceptions on legal issues is neither possible nor desirable." Id. And it would violate the First Amendment to "censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer." Id. at 794 (Kennedy, J., concurring).

¶21 Consider the point practically. Many other justices have written opinions expressing strong views on the legality of the current legislative maps.[13] Only a month ago, one justice wrote an opinion in this very proceeding that describes the mere consideration of this original action petition as a "mockery of our justice system."[14] No other justice has decided that they must recuse, even though their prior writings (including from just last year) might indicate firm preconceptions of certain issues in this action. And if prejudgment is the concern, their writings are just as relevant as my campaign remarks. As Justice Scalia explained, "we doubt . . . that a mere statement of position

---

[13] See generally Johnson, 401 Wis. 2d 198.

[14] See Wright v. Wisconsin Elections Comm'n, No. 2023AP1412-OA, unpublished order (Wis. Aug. 15, 2023) (Rebecca Grassl Bradley, J., dissenting), available at: https://acefiling.wicourts.gov/document/eFiled/2023AP001412/692191.

enunciated during the pendency of an election will be regarded by a judge as more binding . . . than a carefully considered holding that the judge set forth in an earlier opinion." Republican Party, 536 U.S. at 781.

¶22 Simply put: If issuing an opinion does not disqualify a judge from hearing future cases that involve similar issues, then neither does expressing agreement with an opinion or describing my values about political issues. That is particularly true here, where I made no pledge about the result of any case, where I repeatedly disavowed any such pledge or promise, where this case did not even exist during my campaign, and where I made clear I will vote based only on the rule of law.[15]

¶23 That leaves only the Legislature's contention that my recusal is required by Wis. Stat. § 757.19(2)(g) and (f). Paragraph (g) simply requires me to make the subjective determination that I can decide this case impartially both in fact and appearance. I have determined that I can do both. Paragraph (f) requires me to determine whether I have a "significant personal interest" in the outcome of this case. The Legislature claims that I have a personal interest in keeping my word by invalidating

---

[15] This conclusion follows from all the precedents cited herein and also under an application of the objective "actual bias" standard from the Caperton case (which applies to campaign statements, as well).

14

Wisconsin's legislative maps.  That argument fails because I made no promise or commitment to voters about how I would decide any case.  I simply expressed my personal opinions as permitted by Republican Party.  When I put on my robe, I put my personal opinions aside.

¶24  Consistent with the oath I swore, my highest obligation is to "faithfully and impartially discharge the duties of [my] office."  Those duties include participating in a case when the law does not require me to recuse.  Here, under that legal standard, I must respectfully deny this motion.

## II.  ANALYSIS

### A.  The Due Process Clause and Campaign Contributions

#### 1.  Facts

¶25  In 2016, Governor Scott Walker appointed Daniel Kelly to the Wisconsin Supreme Court.  After serving four years, he ran to retain his seat in 2020.  His opponent, now Justice Jill J. Karofsky, won the election by almost 11 points.

¶26  In 2023, I ran for an open seat on the Wisconsin Supreme Court, and Justice Kelly opposed me.  Total spending on the race smashed all records.  Current estimates range from $51 million to

$56 million, making it the most expensive state supreme court race in the nation's history.[16]

¶27  In 2015, the Legislature (led by Republicans) enacted a law permitting political parties to make <u>unlimited</u> donations directly to a judicial candidate's campaign committee.  See Wis. Stat. § 11.1104(5).  Pursuant to this law, the DPW donated $9.9 million to my campaign committee during the 2023 race.

¶28  Total spending in support of my campaign is currently estimated to be $29.1 million.  This figure includes the estimated $17.4 million spent by my campaign committee and an estimated $11.7 million spent by outside groups.  The DPW's contribution represents about 33 percent of the total amount spent in support of my campaign and 57 percent of the amount my campaign committee spent.

¶29  Total spending in support of Justice Kelly's campaign is estimated to be over $20.5 million.

¶30  The DPW's $10 million contribution to my campaign currently represents about 19 percent of the approximately $51 million price tag for the 2023 Wisconsin Supreme Court race.

---

[16] The spending estimates in this section may be found at: Wisconsin Supreme Court Race Cost Record $51M, Wis. Democracy Campaign (July 18, 2023) https://www.wisdc.org/news/press-releases/139-press-release-2023/7390-wisconsinsupreme-court-race-cost-record-51m.

## 2. Caperton

¶31 The United State Supreme Court has found a due process violation based on allegations of judicial bias only in extraordinary circumstances. Prior to Caperton, two types of cases required a judge to recuse. One was where the judge had financial incentives to rule one way in a case. Caperton, 556 U.S. at 876 (citing Tumey v. Ohio, 273 U.S. 510 (1927)). The other was where the judge charged a defendant with criminal contempt and then tried to preside over the contempt proceedings. Id. at 880 (citing In re Murchison, 349 U.S. 133 (1955)). The first and only time the Court found a due process violation in the context of a judicial election is Caperton. Id. at 884. The Court carefully limited its holding to circumstances it called "extraordinary," "exceptional," "rare," and "extreme by any measure." Id. at 884, 887, 890.

¶32 In Caperton, a jury awarded a verdict of over $50 million against Massey Coal Company. Id. at 872. Two years later, Massey lost post-verdict motions. Id. Its next logical step was to file an appeal. At that point, West Virginia held a supreme court of appeals election. Id. at 873. Don Blankenship, Massey's CEO, contributed $3 million to Attorney Brent Benjamin's bid to replace incumbent Justice Warren McGraw on that court. Id. Benjamin won the election by fewer than 50,000 votes. Id.

¶33  Once in office, Justice Benjamin cast the deciding vote to reverse the $50 million verdict against Massey.  Id. at 874. Against this backdrop, Caperton recognized that in "extreme" or "extraordinary" situations a judge's receipt of a campaign contribution from a litigant or a lawyer may require his recusal under the Due Process Clause.  Id. at 884, 886-87.

¶34  Caperton noted that "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal."  Id. at 884.  A campaign contribution offends due process where "there is a serious risk of actual bias——based on objective and reasonable perceptions."  Id.  That occurs "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent."  Id.  This test requires a court to assess:  (1) "the contribution's relative size in comparison to the total amount of money contributed to the campaign," (2) "the total amount spent in the election," and (3) "the apparent effect such contribution had on the outcome of the election."  Id. at 884.

¶35  Applying this test, Caperton found the risk that Blankenship's influence engendered actual bias was sufficiently substantial that due process required Benjamin's recusal from the case.  Id. at 886-87.  Blankenship donated $3 million to unseat

18

the incumbent and replace him with Benjamin. Id. at 873. Specifically, he contributed $1,000 to Benjamin's campaign committee, almost $2.5 million to a political organization supporting Benjamin, and $500,000 in independent expenditures to pay for mailings, solicitations, and advertisements for Benjamin. Id. Blankenship's contributions exceeded the total amount contributed by all of Benjamin's other supporters by 300 percent. Id. He spent $1 million more than the total amount spent by the campaign committees of both candidates combined. Id. And Benjamin won by less than 50,000 votes. Id.

¶36 Caperton also found the temporal relationship between the campaign contributions, the justice's election, and the pending case troubling. When Blankenship made his donations, it was reasonably foreseeable that Benjamin would be reviewing a judgment that cost his biggest donor $50 million. Id. at 886. Caperton held: "On these extreme facts the probability of actual bias rises to an unconstitutional level." Id. at 886-87.

### 3. Application of Caperton

### a. "A Person With A Personal Stake In A Particular Case"

¶37 The Legislature's claim that the DPW's donation offends due process fails for one simple reason: Caperton applies to campaign spending by a "person with a personal stake in a particular case." Id. at 884. Unlike Blankenship, who had a direct personal and financial interest in the judgment against his

19

company, the DPW is not a party to this case. I am not reviewing a judgment against the DPW. Neither the petitioners in this case nor their attorneys are alleged to have contributed to my campaign.

¶38 Nor are the petitioners stand-ins for the DPW. They are citizens who allege violations of their own individual rights. As voters, they claim to advance legal interests in excluding partisan influence of all kinds from the districting process. They want the maps ungerrymandered. For this reason, their interests may be contrary to those of the DPW because they could also foreclose a Democratic gerrymander in the future. To be blunt: Ungerrymandering the map favors voters, not parties.

¶39 For me to recuse myself based on campaign contributions from the DPW——a non-party to this case——would be unprecedented. It would also raise unprecedented problems for my colleagues. In recent Wisconsin Supreme Court elections, the winning candidate has received substantial financial support from a single entity. In 2016, Wisconsin Alliance for Reform spent $2.6 million supporting Justice Rebecca Grassl Bradley's campaign, comprising 46.2 percent of total spending in that election. In 2018, Greater Wisconsin Committee spent $940,000 supporting Justice Rebecca Frank Dallet's campaign, comprising 17 percent of total spending in that election. In 2019, the Republican State Leadership Committee spent $1.25 million supporting Justice Brian Hagedorn's campaign, comprising 15.2 percent of total spending on that

20

election.   In 2020, A Better Wisconsin Together Political Fund spent $1.88 million supporting Justice Jill J. Karofsky's campaign, comprising 18.8 percent of total spending that election.[17]

¶40  The Legislature's dramatic expansion of Caperton would force Wisconsin justices to recuse whenever their involvement in a case might somehow indirectly benefit groups that provided substantial support to their campaigns.  It would invite litigants to seek recusal of "conservative" or "liberal" justices whenever a case involved issues of great social, political, or commercial importance to any major campaign funder.  See County of Dane, 403 Wis. 2d 306, ¶91 (Hagedorn, J., concurring) ("We have seen bias and recusal allegations increase greatly in recent years, turning the obligation of adjudicator impartiality into a litigation weapon.").  Instead of being rare, "disqualification would be routine and even structural. Members of the court would be prevented from hearing a substantial number of cases for the entire duration of the terms they were elected by voters to serve, and the court's ability to do its work would be compromised."  See Philip Morris USA, Inc. v. Appellate Ct., No. 117689 at 11 (Ill. Sept. 24, 2014) (Order of Karmeier, J.).[18]

---

[17] Clinger & Yablon, supra note 8, at 28.

[18] Available at: https://perma.cc/5TYD-ZHCF.

¶41 The supreme court would grind to halt. This is not hyperbole. As Wisconsin law stands, when a justice recuses, there is no back-up justice to step in. The court proceeds with less than a full bench. If even one justice recuses, the remaining six justices may divide equally on the case, leaving a lower court decision on an issue of statewide importance unreviewed and unreviewable. State v. Henley, 2010 WI 12, ¶35, 322 Wis. 2d 1, 778 N.W.2d 853 (Memorandum of Roggensack, J.) (citing Laird v. Tatum, 409 U.S. 824 (1972) (Memorandum of Rehnquist, J.)). If two or more justices recuse, the supreme court may be unable to issue a majority opinion in the case.

b. "Significant and Disproportionate Influence"

¶42 The Legislature's due process claim also fails under Caperton's three-factor test for assessing whether campaign spending had "a significant and disproportionate influence" in placing a judge on a case. In Caperton, Blankenship bankrolled Benjamin' campaign. The facts of this case are nowhere close to those "extreme" and "extraordinary" circumstances.

¶43 First, the DPW's contribution was 57 percent of the spending by my campaign committee. The relative size of the DPW's contribution is not unusual for a Wisconsin Supreme Court race. In 2019, Justice Brian Hagedorn's campaign committee spent an estimated $1.7 million. The Republican State Leadership Committee spent $1.25 million (or 73 percent of his committee spending)

22

supporting his campaign.[19]  In 2020, Justice Jill J. Karofsky received about $1.36 million from the DPW, which was about 50 percent the amount spent by her campaign committee.[20]  Both justices sat on the last redistricting case, Johnson, 401 Wis. 2d 198.[21]

¶44  Second, while the total amount of spending in support of my campaign is unknown, it is currently estimated at $29.1 million. The DPW's contribution represents about 33 percent of it.  Total spending in support of both candidates is currently estimated to be $51 million, which means that the DPW's $9.9 million contribution is just 19 percent of all spending on the race.

---

[19] Spending estimates for Justice Hagedorn's campaign and Justice Karofsky's campaign come from: Wisconsin Supreme Court Finance Summaries, Wis. Democracy Campaign (Apr. 26, 2021), available at: https://www.wisdc.org/follow-the-money/31-nonpartisan-candidates/656-wisconsin-supreme-court-finance-summaries.

[20] The Democratic Party of Wisconsin's contribution is noted in: PAC, Political Committee Contributions More Than Double in Four Years, Wis. Democracy Campaign (Aug. 21, 2020), available at: https://www.wisdc.org/news/press-releases/131-press-release-2020/6669-pac-political-committee-contributions-more-than-double-in-four-years.

[21] Again, it is not unusual for justices to sit on redistricting cases despite having received substantial financial support from either the Republican Party or the Democratic Party. See, e.g., Harper v. Hall, 867 S.E.2d 326 (N.C. 2022) (regarding recusal decisions by Justice Anita Earls and Justice Paul Newby); Dickson v. Rucho, 735 S.E.2d 193 (N.C. 2012) (North Carolina Supreme Court's one-sentence order denying the motion for Justice Newby's recusal).

¶45 Third, the 2023 Wisconsin Supreme Court election was not even close. I won by a landslide. Cf. Caperton, 556 U.S. at 896 (Roberts, C.J., dissenting) (questioning whether a contribution has any effect in a landslide election). The historical record suggests that the DPW's contribution had no impact on the outcome of the 2023 election. Justice Kelly has never won a judicial race. He was appointed to the supreme court. In 2020, he ran to retain his seat and lost to Justice Karofsky by almost 11 points. In 2023, he lost to me by 11 points. The logical conclusion is that the DPW's $10 million donation did not move the needle. It had no discernible influence in placing me on this case.

c. "Temporal Relationship"

¶46 Caperton held that "[t]he temporal relationship between the campaign contributions, the justice's election, and the pendency of case is also critical." Id. at 886. Blankenship contributed $3 million to Benjamin's campaign while Massey's case was pending but before it filed an appeal. Id. at 873. This timing made it "apparent that, absent recusal, Justice Benjamin would review a judgment that cost his biggest donor's company $50 million." Id. at 886.

¶47 Again, the facts of this case are different. When the DPW contributed to my campaign there was no pending or imminent case for me to review. Yes, I said that I would enjoy taking a fresh look at Wisconsin's legislative maps. However, the

24

Legislature does not allege that I knew the identity of the petitioners in this case or the nature of their claims.  The petitioners filed their original action four months after the election.  This is not the sort of temporal relationship that alarmed the Caperton Court.

4.  State ex rel. Three Unnamed Petitioners

¶48  My understanding of Caperton is supported by Justice David Prosser's recusal decision in State ex rel. Three Unnamed Petitioners v. Peterson, 2015 WI 103, 365 Wis. 2d 351, 875 N.W.2d 49.  That case involved a John Doe investigation of alleged illegal campaign coordination among certain candidates for elected office and issue-advocacy groups.  Several targets of the investigation spent an estimated $3.3 million in support of Justice Prosser's reelection effort——nearly eight times the amount spent by his campaign committee.  See Appendix B, Prosser Decision at 6.

¶49  According to Justice Prosser, Caperton did not require his recusal.  Id. at 9.  There was no pending or imminent litigation against the John Doe targets when they financially supported his campaign several years earlier.  Unlike Justice Benjamin, he was an incumbent.  And unlike West Virginia, Wisconsin had no procedure for replacing a justice who withdraws from a supreme court case.  Justice Prosser observed that "in a very real sense, a party moving for a justice's recusal is trying to change the composition of the court that will hear its case."  Id.  He admitted that the relative

25

size of the targets' campaign contributions——nearly eight times the amount spent by his campaign committee——appeared "significant and disproportionate" under Caperton. Id. at 10. He reasoned that the contributions were necessary because, under Wisconsin campaign finance law, there was no other way for his campaign committee to respond to issue advocacy distorting his record. Id.

¶50 If Caperton did not compel Justice Prosser's recusal, it certainly does not demand mine. The DPW is not party——or even a subject of——this case. Its financial support is a fraction of, not eight times, my campaign committee spending. Wisconsin still does not have a procedure for replacing a justice who recuses from a case. The Legislature is simply trying to change the composition of the court that hears this case.

¶51 In sum, under Caperton, the distinctions above make all the difference. The DPW's contribution was too small a percentage of my campaign committee's fund and too small a percentage of the overall spending on the race to warrant my disqualification—— especially given that the election was not close and this original action petition was not pending at the time. While the total amount of the DPW's contribution was surely substantial, the 2023 election broke all historical records in Wisconsin, and compared to total election spending, the contribution falls short of Caperton's recusal standard.

## B.  Due Process And Campaign Statements

### 1.  Facts

¶52  During my campaign, I gave interviews, participated in candidate forums and debates, and traveled the state to speak with voters.  I expressed my frank opinions on Wisconsin's legislative maps.[22]  My remarks at a January 9, 2023 candidate forum are representative of what I said on the campaign trail:

> So let's be clear here——the maps are rigged.  Bottom Line.  Absolutely positively rigged.  They do not reflect the people in this state.  They do not reflect accurately, representation in either the state assembly or the state senate.  They are rigged.  Period.  I'm coming right out and saying that.  I don't think you could sell to any reasonable person that the maps are fair . . . .
>
> I believe the gerrymandering decision was wrong.  But as I indicated to you before I can't ever tell you what I'm going to do on a particular case.  But I can tell you my values and common sense tell you that it's wrong . . . .
>
> So as I've indicated, I think those maps are rigged, I think they're unfair.  I don't think they fairly reflect the population in our state.[23]

---

[22] The Legislature's brief includes more than 50 footnotes citing nearly 20 articles that quote me.  They boil down to just nine instances where I commented on Wisconsin legislative maps:  a January 9, 2023 candidate forum; a January 30, 2023 Wisconsin State Journal Candidate Questionnaire; a February 14, 2023 interview on Wisconsin Public Radio's Central Time; a March 1, 2023 Wedge Issues podcast; tweets on March 3, 2023, and March 7, 2023; a PBS interview on March 9, 2023; and a March 21, 2023 candidate debate. I provide citations for my comments on each of the occasions in Appendix A.

[23] Wisconsin Supreme Court Candidate Forum.  See Appendix A.

27

¶53  I made very similar comments on other occasions during my campaign.  I also told voters the following:[24]

> I can't ever tell you what I'm going to do on a particular case.[25]

> I'll always be an impartial justice who upholds our Constitution.[26]

> [W]hile I talk about some of the other issues that are important to both me and all Wisconsinites, all of my decisions are going to be rooted in the law.  I plan to follow the law.  I tell you what my values are because I think that Supreme Court candidates should share with the community and the electorate what their values are.  Nonetheless, I will uphold the law [and] follow the Constitution when I make any decisions.  Nothing is prejudged.[27]

> [W]hat my real values are and what's going to happen in a case can be two different things, right?  I mean, follow the law, you look at the case law, you look at the statutes, you look at the constitution, and you follow where, you know, it leads you.[28]

> [R]emember I'm running for a judicial spot.  I can't promise anybody anything.  I can tell you what my personal value is.[29]

> But the question is am I able to fairly make a decision on a case.  Of course I am.  That's what I spent my entire career doing.  I follow laws I don't always necessarily like or agree with.  You follow the law.

---

[24] I made these statements on occasions noted in Appendix A.

[25] Wisconsin Supreme Court Candidate Forum.  See Appendix A.

[26] Wisconsin State Journal.  See Appendix A.

[27] Wisconsin Public Radio.  See Appendix A.

[28] Wedge Issues Podcast.  See Appendix A.

[29] Pod Save America.  See Appendix A.

That's what you do. I can assure you that every single case that I will ever handle will be rooted in the law. One hundred percent.[30]

¶54 The Wisconsin Judicial Commission investigates and prosecutes allegations that a judge or judicial candidate has violated the Wisconsin Code of Judicial Conduct. The commission received multiple complaints alleging that on several occasions, including at the January 9, 2023 candidate forum, I violated several code provisions by stating my personal views on "contentious political issues."[31]

¶55 First, I allegedly violated the Preamble to the Code, which requires me to "respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system."

¶56 Second, I allegedly violated SCR 60.02, which provides, in part, that a judge shall maintain "high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved."

---

[30] Wisconsin Supreme Court Candidate Debate. See Appendix A.

[31] The complaint and the Wisconsin Judicial Commission's decision are attached to my September 5, 2023 order for supplemental briefing. See Wright v. Wisconsin Elections Comm'n, No. 2023AP1412-OA, unpublished order (Wis. Sept. 5, 2023), available at: https://acefiling.wicourts.gov/document/eFiled/2023AP001412/700504.

29

¶57 Third, I allegedly violated SCR 60.06(3)(a), which, in part, requires a candidate for judicial office to "maintain . . . the dignity appropriate to judicial office and the integrity and independence of the judiciary" and prohibits a candidate for judicial office from manifesting "bias or prejudice inappropriate to judicial office."

¶58 Fourth, I allegedly violated SCR 60.06(3)(b), which prohibits a candidate for judicial office from making "pledges, promises, or commitments" "with respect to cases, controversies, or issues that are likely to come before the court."

¶59 On May 31, 2023, the commission issued a decision stating it had held a meeting, reviewed the complaints, and "carefully considered" the Code of Judicial Conduct provisions noted above in addition to Republican Party, 536 U.S. at 788; Duwe v. Alexander, 490 F. Supp. 2d 968, 976 (W.D. Wis. 2007); and other authorities. The commission dismissed the complaints without action and declared the matter "closed." By declining to file a formal complaint against me, the commission determined that the allegations against me lacked probable cause. See Wis. Stat. § 757.85(3), (5).

2. Due Process and Prejudgment

¶60 The Legislature assails my statements that Wisconsin's legislative maps are "gerrymandered," "rigged," and "unfair;" that the Johnson decision was wrong; and that I agree with the dissent

30

in that case. According to the Legislature, these statements show that I "promise[d] to 'ma[k]e new law' to achieve a desired outcome," "clearly prejudged the case" in a way irreconcilable with the Due Process Clause, and "announced that [my] mind is firmly made up on the outcome" of this case. Allegedly, when I "declared [my] prejudgment of the maps, 'it became at once apparent that, absent recusal,' [I] would be deciding the validity of something [I] already believed to be invalid."

¶61 There are two fundamental flaws in the Legislature's position. The first is factual. As noted above, while making the statements that the Legislature spotlights I also stressed that these were descriptions of my personal "values," not pledges of "what I'm going to do on a particular case." My repeated assurances that I would follow the law where it leads me expressed my fundamental commitments as a judge. I will set aside my opinions and decide cases based on the law. There will surely be many cases where I reach results that I personally dislike. That is what it means to be a judge. See Caperton, 556 U.S. at 891 (Roberts, C.J., dissenting) ("[A]ll judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise.").

¶62 The second flaw in the legislature's position is that it is foreclosed by federal precedent. The Due Process Clause requires "[a] fair trial in a fair tribunal." In re Murchison,

31

349 U.S. 133, 136 (1955).  It does not prohibit a judge from sitting on a case after expressing an opinion on an issue.  As two legal experts recently explained, "[n]o Supreme Court case has ever held that due process required a judge to recuse because of the judge's expression of views, whether on the campaign trail or elsewhere."[32]  In fact, the Court has rejected such claims.  See FTC v. Cement Inst., 333 U.S. at 702-03 ("[No] decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law."); United States v. Morgan, 313 U.S. 409, 421 (1941) ("That [the Secretary of Agriculture] not merely held but expressed strong views on matters believed by him to have been in issue, did not unfit him for exercising his duty in subsequent proceedings ordered by this Court."); id. (like judges, cabinet officers charged with adjudicatory functions "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."); see also Franklin v. McCaughtry, 398 F.3d 955, 962 (7th Cir. 2005) ("We are not saying that due process would be offended if a judge presiding over a case expressed a general opinion regarding a law at issue in a case before him or her.").

---

[32] Clinger & Yablon, supra note 8, at 10.

32

¶63 More recently, the United States Supreme Court struck down a Minnesota rule that banned judicial candidates from announcing their views of disputed legal or political issues. See Republican Party, 536 U.S. 765. Writing for the Court, Justice Scalia made clear that "[a] judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason." Id. at 777. "For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law." Id. Nor would anybody want to elect such a judge: "Proof that a Justice's mind at the time he joined the Court was a complete [blank slate] in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." Id. at 778 (quoting Laird v. Tatum, 409 U.S. 824 (1972) (Memorandum of Rehnquist, J.)). And it would violate the First Amendment to "censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer." Id. at 794 (Kennedy, J., concurring).

¶64 Justice Scalia explained that judges "have often committed themselves on legal issues that they must later rule upon." Id. at 779 (majority opinion). "Most frequently, of course, that prior expression will have occurred in ruling on an earlier case." Id. But before arriving on the bench, judges also state their views on disputed legal and political issues when

33

teaching classes, giving speeches, or writing books. Id. Thus, they cannot be barred from expressing their views while campaigning for judicial office. Id. at 779-80 (noting that it is permissible for a judicial candidate to say "I think it is constitutional for the legislature to prohibit same-sex marriage" during his campaign).

¶65 Disclosing a predisposition on an issue "is nothing more than acknowledgement of the inescapable truth that thoughtful judicial minds are likely to have considered many issues and formed opinions on them prior to addressing the issue in the context of a case." Duwe, 490 F. Supp. 2d at 975. In contrast, a pledge, promise, or commitment "requires affirmative assurance of a particular action. It is a predetermination of the resolution of a case or issue. It is not a statement of belief or opinion." Id. at 976. A judicial candidate violates the prohibition against pledges, promises, or commitments when she uses phrases like "I will" or "I will not." See id. "Phrases like 'I believe' or 'It is my opinion' signal the absence of a commitment." Id. at 976.

¶66 Justice David Wecht of the Pennsylvania Supreme Court recently applied these same principles to a situation closely resembling this one. See League of Women Voters of Pa. v. Commonwealth, 179 A.3d 1080 (Pa. 2018). After the court declared the state's legislative maps an unlawful partisan gerrymander, the legislative respondents sought to disqualify him from the case.

34

They asserted a due process violation based on Justice Wecht's campaign statements calling gerrymandering "an absolute abomination," "a travesty," "insane," and "deeply wrong." Id. at 1084. Justice Wecht said: "[e]xtreme gerrymandering is . . . antithetical to the concept of one person, one vote." Id. He had also described how Pennsylvania's maps favored Republicans and said: "I challenge anybody to look at a map of our districts and deem them to be compact and contiguous." Id.

¶67 Applying the Due Process Clause, Republican Party, and Duwe, Justice Wecht held that his campaign statements "expressed [his] thoughts on the topic, something manifestly distinct from a clear commitment to rule in a certain way if presented with a specific challenge based upon a well-developed factual record and the benefit of full and fair advocacy." Id. He admitted that his campaign rhetoric was "sometimes ardent" and that he "did not always qualify [his] statements to clarify that [he] would view each case on its individual merits." Id. at 1091. But he concluded that the circumstances of his case were "wholly unlike" the narrow situations in which the United States Supreme Court has mandated recusal based on the Due Process Clause. Id. at 1092.

¶68 Now consider the practical implications of the Legislature's argument. Many current justices on the Wisconsin Supreme Court have written opinions expressing strong views on the

35

legality of the current legislative maps.[33] Only a month ago, one justice wrote an opinion in this very proceeding that describes the mere consideration of the petitioners' claims as a "mockery of our justice system" and "degrad[ing] this court as an institution."[34] No other justice has decided that they must recuse, even though their prior opinions might appear to indicate clear preconceptions of certain issues here. And if prejudgment is the concern, their opinions are just as relevant as my campaign remarks. As Justice Scalia wrote, "[w]e doubt . . . that a mere statement of position enunciated during the pendency of an election will be regarded by a judge as more binding . . . than a carefully considered holding that the judge set forth in an earlier opinion." Republican Party, 536 U.S. at 780-81.

¶69 Simply put: If issuing an opinion does not disqualify a judge from hearing future cases that involve similar issues, then neither does expressing agreement with an opinion or describing my values about political issues. That is particularly true here, where I made no pledge about the result of any case, where I repeatedly disavowed any such pledge or promise, where

---

[33] See generally Johnson, 401 Wis. 2d 198.

[34] See Wright v. Wisconsin Elections Comm'n, No. 2023AP1412-OA, unpublished order (Wis. Aug. 15, 2023) (Rebecca Grassl Bradley, J., dissenting), available at: https://acefiling.wicourts.gov/document/eFiled/2023AP001412/692191.

36

this case did not even exist during my campaign, and where I made clear I will vote based only on the rule of law.

### 3. _Caperton_ and Prejudgment

¶70 Lacking a single case holding that the Due Process Clause requires a judge to recuse based on her campaign statements, the Legislature again resorts to _Caperton_. As far as I can tell, no court has ever applied _Caperton_ in that way. In fact, some justices on the Wisconsin Supreme Court dismissed an attempt to do just that. See _State v. Allen_, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863. Allen had filed a collateral attack on his criminal conviction. On appeal, he asked the supreme court to disqualify Justice Michael Gableman from the case due to his many campaign statements portraying himself as a judge who will support the prosecution over the defense in criminal cases and expressing bias against people accused of crimes, the lawyers who defend them, and the judges who uphold their rights.[35]

¶71 Justice Ziegler regarded the facts of _Allen_ so far removed from _Caperton_ that the prisoner had no due process claim. "[T]he allegations in _Allen_ involve a judicial peer and fail to state a due process claim because no 'person with a personal stake' in _Allen_ 'had a significant and disproportionate influence' in

---

[35] See Mot. for Recusal, _Allen_, 322 Wis. 2d 372 (Apr. 17, 2009), available at: https://perma.cc/8TAA-D7MU.

placing Justice Gableman on the case 'by raising funds to directing [his] election campaign when the case was pending or imminent." Allen, 322 Wis. 2d 372, ¶271 (Ziegler, J., concurring) (quoting Caperton, 556 U.S. at 884). "[N]owhere in the Caperton decision does the Supreme Court state that any lesser fact situation would have required Justice Benjamin's recusal in that case, and nowhere does the Supreme Court conclude that he would be required to recuse himself from an unrelated civil case that involved different parties." Id., ¶269.

¶72 Requiring recusal when neither Allen nor the state had any influence in placing Justice Gableman on the court, Justice Ziegler reasoned, would "invent new law and . . . invite recusal motions based upon 'spin' instead of whether a justice can be fair and impartial." Id. By making allegations that "fail to state a due process claim as set forth in Caperton, Allen's efforts effectively amount to 'judge shopping.'" Id., ¶262. "'[J]udge Shopping' damages this court as an institution, inappropriately politicizes the court, and nullifies the votes of the electorate." Id.

¶73 Justice Roggensack interpreted Caperton's holding even more narrowly. She agreed that "Allen's allegations do not even begin to approach a due process violation." Id., ¶231 (Opinion of Roggensack, J.). She explained that his claim "is not comparable to the claim made in Caperton. Caperton was based on claims of

particularized bias against a party in a pending case because of actions taken by the other party. . . .   Those actions were alleged to have directly benefitted a justice who at the time was about to decide" the case.   Id., ¶238 (citing Caperton, 556 U.S. at 884, 886).

¶74   The Legislature has likewise failed to state a claim that my campaign statements about Wisconsin's legislative maps violate due process under Caperton.   Its motion is an attempt "to invent new law" and amounts to judge shopping, which inappropriately politicizes this court and attempts to nullify the votes of the electorate.   I decline to extend Caperton's holding that far.

4.   The Effect of the Wisconsin Judicial Commission's Decision

¶75   Finally, the Wisconsin Judicial Commission's May 31, 2023 decision provides the death blow to the Legislature's due process argument.   Codes of judicial conduct are the "principal safeguard against judicial campaign abuses."   Caperton, 566 U.S. at 889 (quoted source omitted).   "The Due Process Clause demarks only the outer boundaries of judicial qualifications."   Id. "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution." Id. at 890; see also State v. Hermann, 2015 WI 84, ¶120, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring).

39

¶76 The commission rejected claims that my campaign statements undermined the integrity and independence of the judiciary; demonstrated bias or prejudice; or committed me to a decision on a case, controversy, or issue that was likely to come before me.[36] That disposes of the Legislature's claims that my campaign statements violate due process.

¶77 For the sake of completeness, I want to clarify two campaign statements that, as far as I can tell, the commission's decision did not directly address. First, on the campaign trail I said: "I would anticipate that I would enjoy taking a fresh look at the gerrymandering question."[37] Allegedly, this "invited a legal challenge" to replace Wisconsin's maps. The Legislature omits my qualification of that statement. I explicitly stated that whether the issue "will come to the court is a completely different question."[38]

¶78 Similarly, the Legislature isolates my comment "[p]recedent changes when things need to change to be fair"[39] from my full remarks and calls it a "promise to 'ma[k]e new law' to

---

[36] See supra note 31.

[37] Wedge Issues Podcast. See Appendix A.

[38] Wedge Issues Podcast. See Appendix A.

[39] Wisconsin Supreme Court Candidate Debate. See Appendix A.

achieve a desired outcome."  I made this comment about precedent in response to a general question about stare decisis.  I was talking about <u>Plessy v. Ferguson</u>, 163 U.S. 537 (1896).  I was not referring to <u>Johnson</u>.[40]

¶79  Like my other campaign statements about Wisconsin's legislative maps, my expressed desire to take a fresh look at the maps and my explanation of stare decisis show that I had opinions on political and legal issues of the day.  Nothing more.

### C.  Wisconsin Law

#### 1.  Recusal Under Wis. Stat. § 757.19(2)(g)

¶80  The Legislature contends that under § 757.19(2)(g) I must recuse due to my campaign statements.  Section 757.19(2)(g) provides that "[a]ny judge shall disqualify himself or herself from any civil or criminal action or proceeding . . . [when] a judge determines that, for any reason, he or she cannot, or it appears that she or she cannot, act in an impartial manner."

¶81  This determination is purely subjective.  The judge alone decides whether she can be impartial, and whether there is an appearance of partiality.  Section 757.19(2)(g) "does not require disqualification in a situation where one other than the judge objectively believes there is an appearance that the judge is unable to act in an impartial manner" or in a situation where

---

[40] Wisconsin Supreme Court Candidate Debate. <u>See</u> Appendix A.

41

"the judge's impartiality 'can reasonably be questioned' by someone other than the judge." State v. Am. T.V. & Appliance of Madison, Inc., 151 Wis. 2d 175, 183, 443 N.W. 662 (1989); see also Donohoo v. Action Wis. Inc., 2008 WI 110, ¶24, 314 Wis. 2d 510, 754 N.W.2d 480.

¶82  When a justice decides that, both in fact and in appearance, she can act in a fair and impartial manner, the supreme court's role is limited to determining that she went through the required exercise of making the subjective determination. Donohoo, 314 Wis. 2d 510, ¶24; State v. Harrell, 199 Wis. 2d 654, 663-64, 546 N.W.2d 115 (1996); Am. T.V., 151 Wis. 2d at 182-84.

¶83  In Donohoo, the appellant, citing § 757.19(2)(g) and the Wisconsin Code of Judicial Conduct, moved to disqualify Justice Louis Butler from a lawsuit against an organization dedicated to protecting the civil rights of lesbian, gay, bisexual, and transgender people.  Justice Butler had received campaign contributions from two board members of a political action committee for the organization and a reelection endorsement by the organization's attorney.  He also gave a speech at a fundraiser for a political action committee that supported LGBTQ equality. Donohoo, 314 Wis. 2d 510, ¶¶8-14.

¶84  Despite these facts, Justice Butler declined to recuse himself from the case.  In a letter to the parties, he said that he had consulted the Executive Director of the Judicial Commission

42

about these matters.  He disclosed the campaign contributions and concluded:  "Because campaign contributions will in no way affect my judgment as to the outcome of this proceeding, I am writing to advise you of my decision to participate in this case."  Id., ¶32. Donohoo held that by sending the letter and continuing to participate in the case "Justice Butler clearly determined that he could be impartial.  That is all that is required by § 757.19(2)(g)."  Id., ¶25.

¶85  Similarly, in Three Unnamed Petitioners the state moved for Justice Prosser's recusal based partly on § 757.19(2)(g). Despite having received $3.3 million in campaign support from the targets of the John Doe investigation under review, he determined that he could decide the case impartially and it would not appear otherwise to a reasonable person who understands the facts.[41]

¶86  I likewise find no basis for my recusal under § 757.19(2)(g).  I was a circuit court judge for 10 years before becoming a supreme court justice.  I have decided many difficult cases.  I approached them with an open mind and decided them based on the facts and the law.  I approach supreme court cases the same way.  In fact, during my campaign, I assured voters that "I will always be an impartial justice who upholds the Constitution," "I follow laws I don't always necessarily agree with," and that "every

_____

[41] See Appendix B, Prosser Decision at 2.

43

single case that I handle will be rooted in the law." At my investiture I solemnly swore that I would "faithfully and impartially discharge the duties of the office to the best of my ability so help me God." I meant what I said. I have considered all of the facts and legal authorities presented for and against recusal under § 757.19(2)(g). I determine that I can, in fact and appearance, act in an impartial manner in this case.

### 2. Recusal Under Wis. Stat. § 757.19(2)(f)

¶87 The Legislature also contends that § 757.19(2)(f) requires my recusal. Section 757.19(2)(f) provides that a judge shall disqualify herself from a case when she "has a significant financial or personal interest in the outcome of the matter." The Legislature does not claim that I have a "financial interest" in this case. It argues that because I "repeatedly declared to voters how [I] would vote on the merits of this case" I have "a substantial interest in keeping [my] word and preserving [my] reputation among voters by invalidating the maps."

¶88 A recusal motion based on § 757.19(2)(f) is different from a motion based on § 757.19(2)(g). Whereas § 757.19(2)(g) requires the judge to make a subjective determination about her ability to be impartial in fact and appearance, § 757.19(2)(f) requires the judge to make an objective determination that she does or does not have significant personal interest in the outcome of a case as established by evidence and reasonable inferences.

44

State ex rel. Dressler v. Cir. Ct. for Racine Cnty., 163 Wis. 2d 622, 643, 472 N.W.2d 532 (Ct. App. 1991). If the evidence and inferences establish that the judge does have a significant personal interest in a case, § 757.19(2)(f) requires her recusal.

¶89 The Legislature cites no case where a judge's campaign statements were held to create a "significant personal interest" in the outcome of a case thereby requiring recusal under § 757.19(2)(f). Moreover, the Legislature does not cite a single instance during my campaign where I "declared to voters how [I] would vote on the merits of this case." This case did not even exist during my campaign. The petitioners filed it four months after the election.

¶90 During my campaign, I told voters my personal values and beliefs about Wisconsin's legislative maps and said that I would enjoy taking a fresh look at them——as permitted by the First Amendment and Republican Party. I did not say "I will" or "I will not" decide this case or any other case a certain way. See Duwe, 490 F. Supp. 2d at 976. To the contrary, I repeatedly told voters that I could not say how I would decide any particular case and that I must follow the law where it leads me, even if I disagree with it.

¶91 While Republican Party did not concern § 757.19(2)(f), it considered and rejected the premise of the Legislature's argument. In that case, Justice Scalia responded to the argument

45

that campaign statements pose a special threat to open-mindedness because once the candidate becomes a judge he will feel reluctant to contradict them. Republican Party, 536 U.S. at 780. He observed that this "might be plausible, perhaps, with regard to campaign promises. A candidate who says 'if elected, I will vote to uphold the legislature's power to prohibit same-sex marriages' will positively be breaking his word if he does not do so." Id. (emphasis in original). But it is not true that a judge who states his position on issues during a campaign will feel compelled to rule in accordance with them. Justice Scalia explained:

> We doubt, for example, that a mere statement of position enunciated during the pendency of an election will be regarded by a judge as more binding——or as more likely to subject him to popular disfavor if reconsidered——than a carefully considered holding that a judge set forth in an earlier opinion denying some individual's claim to justice.

Id. at 780-781.

¶92 The Legislature offers no facts establishing or creating a reasonable inference that my campaign statements created a "significant personal interest" in the outcome of this case. Nor does it cite any case to support that argument. I therefore objectively determine that § 757.19(2)(f) does not require my recusal.

¶93 The Legislature makes one passing reference to SCR 60.04(1)(b) without developing an argument. Rule 60.04(1)(b) provides in part that "a judge may not be swayed by partisan

46

interests, public clamor, or fear of criticism." It does not support recusal under § 757.19(2)(f) because "a judge's propensity to decide cases consistent with statements made or opinions expressed during a campaign tend to demonstrate that he or she is acting on personal principles previously stated and not deciding the pending case on the basis of 'partisan interests, public clamor or fear of criticism.'" Duwe, 490 F. Supp. 2d at 973. Accordingly,

IT IS ORDERED that the Motion to Recuse filed by proposed intervenor Wisconsin Legislature is denied.

47

APPENDIX A
Campaign Statement Sources


1. Wisconsin Supreme Court Candidate Forum – Jan. 9, 2023

   a. WisPolitics State Supreme Court Election Forum, WisconsinEye (Jan. 9, 2023), available at: https://wiseye.org/2023/01/09/wispolitics-state-supreme-court-election-forum.


2. Wisconsin State Journal – Jan. 30, 2023

   a. Alexander Shur, Candidate Q&A: Wisconsin Supreme Court, Wis. State J. (Jan. 30, 2023), available at: https://madison.com/news/local/govt-and-politics/elections/candidate-q-a-wisconsin-supreme-court/article_fb416ee5-a99e-5a8f-b43d-d4652861a65e.html [https://perma.cc/EE2H-ZKZB].


3. Wisconsin Public Radio – Feb. 14, 2023

   a. Jonah Beleckis, Janet Protasiewicz Thinks Judicial Candidates Should Be Open About Their Values, Wis. Pub. Radio (Feb. 14, 2023), available at: https://www.wpr.org/janet-protasiewicz-wisconsin-supreme-court-justice-primary-election [https://perma.cc/C9V6-N9C8].


4. Wedge Issues Podcast – Mar. 2, 2023

   a. Jessie Opoien & Jack Kelly, Janet Protasiewicz Discusses Supreme Court Bid On Wedge Issues Podcast, Cap Times (Mar. 2, 2023), available at: https://captimes.com/news/government/janet-protasiewicz-discusses-supreme-court-bid-on-wedge-issues-podcast/article_111d3475-e040-5e43-a932-06819cadc036.html.


5. X (f.k.a. Twitter) – Mar. 3, 2023

   a. @janetforjustice, X (Mar. 3, 2023, 5:31PM), https://x.com/janetforjustice/status/1631799609751117825?s=46&t=9FuOdnLF34m1gMWomZ5G-g.

6. X (f.k.a. Twitter) – Mar. 7, 2023

    a. @janetforjustice, X (Mar. 7, 2023, 1:15PM), https://x.com/janetforjustice/status/1633184736263696386?s=20.


7. PBS Wisconsin – Mar. 9, 2023

    a. Zac Schultz, <u>Janet Protasiewicz, Daniel Kelly On Wisconsin Redistricting</u>, PBS Wis. (Mar. 9, 2023), <u>available at</u>: https://pbswisconsin.org/news-item/janet-protasiewicz-daniel-kelly-on-wisconsin-redistricting [https://perma.cc/4HH9-PXHP].


8. Pod Save America – Mar. 20, 2023

    a. <u>Pod Save America: Mugshots and Milk Shots (Live from Wisconsin!)</u>, Crooked Media (Mar. 20, 2023), <u>available at</u>: https://crooked.com/podcast/mugshots-and-milk-shots-live-from-wisconsin.


9. Wisconsin Supreme Court Candidate Debate – Mar. 21, 2023

    a. <u>State Bar of Wisconsin, WISC-TV, WisPolitics.com Supreme Court Debate</u>, WisconsinEye (Mar. 21, 2023), <u>available at</u>: https://wiseye.org/2023/03/21/state-bar-of-wisconsin-wisc-tv-wispolitics-com-supreme-court-debate.



**Office of the Clerk**

## Supreme Court of Wisconsin

**110 East Main Street, Suite 215**
**P.O. Box 1688**
**Madison, WI 53701-1688**

**Telephone (608) 266-1880**
**Facsimile (608) 267-0640**
**Web Site: www.wicourts.gov**

July 29, 2015

**To: See Attached Service List**

You are hereby notified of the following:

---

| Nos. | 2013AP2504-08-W | Three Unnamed Petitioners v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |

2014AP296-OA    Two Unnamed Petitioners v. Peterson
L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11

2014AP417-421-W    Schmitz v. Peterson
L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

Before David T. Prosser, J.

On February 12, 2015, Special Prosecutor Francis D. Schmitz filed under seal a Motion for Recusal directed to Justice David Prosser seeking his disqualification from participation in the above-captioned cases. On July 16, 2015, the Motion for Recusal was denied. A comment accompanying the order denying the Motion for Recusal stated that a separate writing would follow. That separate writing is attached.

---

Diane M. Fremgen
Clerk of Supreme Court

July 29, 2015
Page 2

**Service List:**

Susan K. Raimer
Columbia County Clerk of Circuit Court
P.O. Box 587
Portage, WI 53901-2157

Carlo Esqueda
Dane County Clerk of Circuit Court
215 S. Hamilton Street
Madison, WI 53703

Lynn M. Hron
Dodge County Clerk of Circuit Court
210 W. Center Street
Juneau, WI 53039

Lia Gust
Iowa County Clerk of Circuit Court
222 N. Iowa Street
Dodgeville, WI 53533

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th Street, Rm. G-8
Milwaukee, WI 53233

Matthew W. O'Neill/ Diane Slomowitz
Fox O'Neill Shannon
622 N. Water Street, Suite 500
Milwaukee, WI 53202

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

Dean A. Strang
StrangBradley, LLC
10 E. Doty Street, Suite 621
Madison, WI 53703

Brad D. Schimel
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Todd P. Graves/ Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Edward H. Meyers/ Philip J. O'Beirne
Julie O'Sullivan
Stein Mitchell Muse & Cippollone
1100 Connecticut Avenue NW, Suite 1100
Washington, D.C. 20036

Michael J. Bresnick
Venable LLP
575 Seventh Street NW
Washington, D.C. 20004

Directors Office
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Dennis P. Coffey
Mawicke & Goisman, SC
1509 N. Prospect Avenue
Milwaukee, WI 53202-2323

Steven M. Biskupic/ Michelle L. Jacobs
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Suite 106
Mequon, WI 53092

Hon. Gregory A. Peterson
Reserve Judge

Sean O'Donnell Bosack
Godfrey & Kahn, S.C.
780 N. Water Street, Suite 700
Milwaukee, WI 53202-3512

July 29, 2015
Page 3

**Service List:**

Eric J. Wilson
Godfrey & Kahn, S.C.
P.O. Box 2719
Madison, WI 53701-2719

Timothy M. Hansen/ James B. Barton
John P. Shanahan
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee Street, Suite 200
Milwaukee, WI 53202-5885

H.E. Cummins
1818 N. Taylor Street, Suite 301
Little Rock, AR 72207

Jeffrey James Morgan
LeBell, Dobrowski & Morgan, LLP
309 N. Water Street, Suite 350
Milwaukee, WI 53202

Hon. Gregory J. Potter
Wood County Courthouse
P.O. Box 8095
Wisconsin Rapids, WI 54494

Hon. James P. Daley
Rock County Courthouse
51 S. Main Street
Janesville, WI 53545-3951

Hon. James J. Duvall
Buffalo County Courthouse
P.O. Box 68
Alma, WI 54610-0068

Hon. Jeffrey A. Kremers
Milwaukee County Courthouse
901 N. 9th Street
Milwaukee, WI 53233

Thomas R. Cannon
O'Neil, Cannon & Hollman, S.C.
111 E. Wisconsin Avenue, #1400
Milwaukee, WI 53202-4803

Michael D. Dean
Michael D. Dean, LLC
17035 W. Wisconsin Avenue, Suite 100
P.O. Box 2545
Brookfield, WI 53008

Susan M. Crawford
Cullen Weston Pines & Bach LLP
122 W. Washington Avenue, #900
Madison, WI 53703

Christopher M. Meuler
Friebert, Finerty & St. John, S.C.
330 E. Kilbourn Avenue, Suite 1250
Milwaukee, WI 53202

Richard M. Esenberg
Wisconsin Institute for Law & Liberty
1139 E. Knapp Street
Milwaukee, WI 53202-2828

Paul M. Ferguson
Troupis Law Office
4126 Timber Lane
Cross Plains, WI 53528

Nathan W. Judnic
Wis. Government Accountability Board
212 E. Washington Avenue, 3rd Floor
Madison, WI 53703

Matthew M. Fernholz
Cramer, Multhauf & Hammes, LLP
1601 E. Racine Avenue, Suite 200
P.O. Box 558
Waukesha, WI 53187-0558

July 29, 2015

Dear Counsel:

On February 12, 2015, Special Prosecutor Francis D. Schmitz filed a motion requesting my recusal "from all further proceedings" in the three cases relating to a John Doe investigation then pending before the court. The special prosecutor outlined multiple grounds for his motion and cited Wis. Stat. § 797.19 (sic), SCR 60.03, and SCR 60.04(1) and (4) as authority for his position. Although I denied the Special Prosecutor's motion on July 16, 2015, at the time the three cases were decided, I made a commitment then to explain the basis for the denial. This writing will serve that purpose.

I

Wisconsin Stat. § 757.19, entitled "Disqualification of judge," reads in part:

(2)     Any judge shall disqualify himself or herself from any civil or criminal action or proceeding when one of the following situations occurs:

. . . .

(f)     When a judge has a significant financial or personal interest in the outcome of the matter. . . .

(g)     When a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner.

Paragraphs (a) through (f) "are susceptible of objective determination, that is, without recourse to the judge's state of mind." State v. Am. TV & Appliance, 151 Wis. 2d 175, 182, 443 N.W.2d 662 (1989). To the best of my knowledge, I do not have "a significant financial or personal interest in the outcome" of the three cases before the court, and I do not understand the special prosecutor to allege that I do.

Paragraph (g) is different from the preceding paragraphs. This paragraph "concerns not what exists in the external world subject to objective determination, but what exists in the judge's mind. . . . The determination of a basis for disqualification here is subjective." Id.

This paragraph, according to our established precedent, "does not require disqualification in a situation where one other than the judge objectively believes there is an appearance that the judge is unable to act in an impartial manner." Id. at 183. It does not require disqualification in a situation in which "the judge's impartiality 'can reasonably be questioned' by someone other than the judge." Id.

Thus, my obligation under Wis. Stat. § 757.19(g) is to determine whether, for any reason, I believe that I cannot, or I believe that it appears that I cannot, act in an impartial manner.

July 29, 2015
Page 2

I conclude that I can act in an impartial manner in this matter and that it does not appear otherwise to a reasonable person who understands the facts.

On two occasions, both before and after the special prosecutor's motion, I wrote separately on orders issued by the court with respect to these matters. In both writings, I disagreed with a majority of the court.

In addition, I have approached the John Doe cases before the court in the same manner I have approached other cases over the past 17 years. Because I came to the court with a partisan background in legislative service and did not have formal judicial experience, I have assumed that many persons would be skeptical about my opinions, especially if those opinions related to political controversies. Consequently, I have tried to issue opinions that fully set out the facts on which my decisions are grounded and fully reveal my thinking and analysis in relation to the law as best I understand it. I have tried to avoid stating facts or conclusions without support. I have tried to base my decisions on precedent, on statutory language, or on clearly stated policy determinations, so that people who disagree with the results of my decisions can focus on my legal analysis, rather than on their preference for different outcomes.

Wisconsin Stat. § 757.19 provides in subsection (5) that "when a judge is disqualified, the judge shall file in writing the reasons and the assignment of another judge shall be requested under s. 751.03." Were I to disqualify myself in this matter, I would not be able to state reasons that would not apply equally to many other judges in a state that has historically elected judges, and I would not be able to request "the assignment of another judge" because assignment of another person to serve as a justice on the Wisconsin Supreme Court is simply not possible under current law.

II

The special prosecutor also cited SCR 60.03 and SCR 60.04(1) and (4).

SCR 60.03 contains general language that "(1) A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." This broadly-worded provision cannot mean that a judge must step aside every time a litigant claims that a judge's participation in a case will undermine public confidence in the court.

The most relevant parts of SCR 60.04 are contained in subsections (4), (7), and (8). Subsection (4) reads in part:

> (4) Except as provided in sub. (6) for waiver, a judge shall recuse himself or herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial . . . .

(Emphasis added.)

The highlighted language in this subsection appears to seek an objective standard that is different from Wis. Stat. § 757.19(g). The scope of the language is very broad, meaning that it is intended to apply to situations beyond those enumerated in paragraphs (a)-(f). However, the language in (4) is dangerously subjective for the non-judicial people seeking to interpret it, permitting such people to be influenced by their policy biases. That is one reason why the court added subsections (7) and (8) addressing the controversial issue of campaign finance:

(7) Effect of Campaign Contributions. A judge shall not be required to recuse himself or herself in a proceeding based solely on any endorsement or the judge's campaign committee's receipt of a lawful campaign contribution, including a campaign contribution from an individual or entity involved in the proceeding.

(8) Effect of Independent Communications. A judge shall not be required to recuse himself or herself in a proceeding where such recusal would be based solely on the sponsorship of an independent expenditure or issue advocacy communication (collectively, an "independent communication") by an individual or entity involved in the proceeding or a donation to an organization that sponsors an independent communication by an individual or entity involved in the proceeding.

A third relevant provision is found in SCR 60.06(4), which reads:

(4) Solicitation and Acceptance of Campaign Contributions. A judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions. A candidate may, however, establish a committee to solicit and accept lawful campaign contributions. The committee is not prohibited from soliciting and accepting lawful campaign contributions from lawyers, other individuals or entities even though the contributor may be involved in a proceeding in which the judge, candidate for judicial office, or judge-elect is likely to participate. A judge or candidate for judicial office or judge-elect may serve on the committee but should avoid direct involvement with the committee's fundraising efforts. A judge or candidate for judicial office or judge-elect may appear at his or her own fundraising events. When the committee solicits or accepts a contribution, a judge, candidate for judicial office, or judge-elect should also be mindful of the requirements of SCR 60.03 and 60.04(4); provided, however, that the receipt of a lawful campaign contribution shall not, by itself, warrant judicial recusal.

The history of SCR 60.04(7) and (8) and SCR 60.06(4) deserves discussion.

On June 20, 2008, the League of Women Voters of Wisconsin filed Petition 08-16 asking for amendments to the Wisconsin Code of Judicial Conduct, specifically SCR 60.01 and SCR 60.04(4) and (6). In essence, the League sought to amend SCR 60.04(4) to require a judge to recuse himself or herself if "a party to the proceeding made a contribution of $1,000 or more to

July 29, 2015
Page 4

support the judge's election to the judge's current or prospective judicial position." The petition also sought to require a judge's recusal in a proceeding involving an individual or entity that paid for certain "mass communications" that include a "reference to the judge or another candidate" for the judicial position.

The League pointedly asked the supreme court to act promptly on its proposed petition "so that the public hearing can be held so that donors, third parties who spend money to influence campaigns, and judicial candidates will have a clear understanding of the impact of making or accepting contributions, and of spending money to influence the spring 2009 judicial campaigns."

The spring 2009 judicial campaign was Chief Justice Abrahamson's reelection campaign. On October 28, 2008, the court briefly considered the League's petition at an open administrative conference. Before the conference, Justice Ann Walsh Bradley approached me in the hallway outside my office and asked for my help in delaying the petition because voting on it before the election would be "embarrassing" to Chief Justice Abrahamson.

The court voted unanimously to delay the petition. Justice Bradley contended at the conference that the petition should not be taken up during an election campaign. Later the delay was explained by some as a desire to wait for the Supreme Court's decision in Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), which was accepted for review by the Supreme Court shortly after the October 28 conference and decided on June 8, 2009.

Milwaukee BizTimes reported after the spring election and after the decision in Caperton that Chief Justice Abrahamson had received 341 "individual campaign donations of $1,000 or more . . . . [Ironically,] [o]nly Justice David Prosser Jr. has not received any individual donations of $1,000 or more." See Steve Jagler, "To recuse or not to recuse," Milwaukee BizTimes (June 28, 2009), http://www.biztimes.com/article/20090628/BLOGS/306289999/0/. The BizTimes article credited a study by the Wisconsin Democracy Campaign for the information. As will be noted, I did not receive any $1,000 contributions in my 2011 election campaign, either.

Following her re-election, Chief Justice Abrahamson began to promote the League's petition and scheduled a hearing for late October 2009. In the meantime, however, the Wisconsin Realtors Association, Inc. and Wisconsin Manufacturers and Commerce (WMC) filed their own petitions to amend SCR 60.04. The Realtors' petition proposed subsection (7); WMC's petition proposed subsection (8), together with an amendment to SCR 60.06(4).

There was an obvious reason for the Realtors' petition. The political action committee affiliated with the Realtors contributed $8,625 to the campaign of Washington County Circuit Judge Annette Ziegler when she was running for the supreme court in the spring of 2007. Later, in July 2007, the Wisconsin Court of Appeals certified a case to the Wisconsin Supreme Court, Wisconsin Realtors Association, Inc. v. Town of West Point, 2007 WI 139, 306 Wis. 2d 42, 743 N.W.2d 441. Justice Ziegler disclosed to the parties and amici that she had received a contribution from the Realtors' PAC. The attorney for the Town of West Point promptly asked Justice Ziegler to withdraw from the case. She did. The court thereafter was unable to decide

the case because of a tie vote and the Realtors organization eventually lost in the court of appeals. The issue in the case was whether state law permits a town to impose a blanket moratorium on real estate developments while the town develops a master zoning plan——an issue of importance to the Realtors' members.

The Realtors were concerned that the organization had been seriously disadvantaged in the West Point case because it had made an open, modest, and completely lawful contribution to a candidate for the supreme court and that it would be disadvantaged in future cases under the League's proposed rule if it made a contribution of only $1,000 to a supreme court candidate who heard a case. WMC, on the other hand, was concerned that its affiliated organization for making independent communications could not engage in issue advocacy without gravely jeopardizing WMC's ability to participate in legal proceedings as a friend of the court.

All this came to a head after a lengthy public hearing on October 28, 2009. At an open administrative conference, a majority adopted the one sentence amendment to SCR 60.04 proposed by the Realtors and the one sentence amendment to SCR 60.04 proposed by WMC. The court rejected the League's petition, a second petition proposed by retired Justice William Bablitch, and a motion to send all proposals to a study committee.

After the vote, this Justice asked WMC to request that the court reopen the rules to make some technical corrections. WMC made the request, and several corrections were made in the text of SCR 60.06(4), at my direction. In addition, I wrote comments to accompany each of the three new provisions. These comments, explaining the basis for the changes, consisted of nine paragraphs containing more than 700 words.

Moreover, Justice Patience Roggensack, joined by three justices, wrote a six page concurrence providing background for and explanation of the rule changes.

Frankly, much of the subsequent criticism of the rule changes has misrepresented their adoption and their effect. The rule amendments were not adopted "word-for-word" or "verbatim," as is often represented by critics. The hundreds of words of comments by the court did not come from the petitioners. The court had two conflicting proposals before it for more than a year, and two petitions were adopted in substance after lengthy testimony at a public hearing and subsequent discussion. The suggestion that the court did not carefully consider the rule changes is thus unfounded.

The rules are grounded in the reality that the law must permit contributions from people and entities who may have cases before the court because some attorneys and some entities are nearly always before the court. Thus, a rule that provides that a "judge shall not be required to recuse himself or herself in a proceeding based solely on . . . the judge's campaign committee's receipt of a lawful campaign contribution" is a rational rule consistent with United States Supreme Court holdings. The rule does not mean that a judge should never recuse himself or herself because of a campaign contribution or independent communication. The court's comments to the rule changes include the following observation:

July 29, 2015
Page 6

> The solicitation of contributions from participants in judicial proceedings is always a matter requiring close, careful attention. Campaign committees should be sensitive to the existence of pending litigation, the proximity of judicial elections, and the wording of campaign solicitations to avoid the appearance of promise or pressure.

SCR 60.06(4) cmt.

### III

This brings us to the nub of the special prosecutor's motion.

The special prosecutor contends that serious ethical issues arise because several "individuals" and "entities" under his investigation had "significant involvement" in my 2011 re-election to the supreme court. Because of secrecy orders sought by the special prosecutor and the Milwaukee County District Attorney's Office, I am not able forthrightly to name names in this writing. However, the special prosecutor alleged that an "estimated $3,344,000" was "contributed" by certain entities "to the benefit of the Justice Prosser re-election effort," "nearly eight times the public funding" spent by the campaign. Thus, "Due Process considerations warranting recusal exist here as existed in" Caperton.

The special prosecutor fails to acknowledge or explain the context in which the 2011 election occurred.

In 2009 the Wisconsin Legislature substantially revised the campaign finance law affecting supreme court elections. See 2009 Wis. Act 89. The maximum individual contribution limit for supreme court candidates, which had been in place since 1974, was reduced from $10,000 to $1,000. Wis. Stat. § 11.26(1)(a) and (1)(am) (2009-10). The maximum committee contribution to a supreme court candidate also was reduced from $8,625 to $1,000. Wis. Stat. § 11.26(2)(a) and (2)(am) (2009-10). These major reductions in contributions were designed to induce, if not force, supreme court candidates to participate in a new public funding plan designed exclusively for supreme court races.

Under the plan, candidates for the supreme court were given the option to register for public funding——$100,000 for a primary election, and $300,000 for a general election. Wis. Stat. § 11.511(2) and (3) (2009-10). To qualify for this public funding, a candidate was required to raise not less than $5,000 nor more than $15,000 "from at least 1,000 separate contributors." Wis. Stat. § 11.502(2) (2009-10). A candidate could also raise up to $5,000 in "seed money contributions" to be used in raising the qualifying contributions from at least 1,000 separate contributors. Wis. Stat. § 11.508(1) (2009-10). In short, a candidate who applied for public funding could not raise more than $20,000 in private contributions for the entire campaign and could not receive—with some inapplicable exceptions—more than $400,000 in public funding.

As a result, a candidate for the supreme court was extremely vulnerable to third-party expenditures, especially if those expenditures were limited to issue advocacy. The only practical and lawful response to issue advocacy attacks on a candidate taking public funding had to come

July 29, 2015
Page 7

from other issue advocacy. This reality became apparent to everyone knowledgeable about the new laws.

These new laws had not applied to Chief Justice Abrahamson who was re-elected in April 2009 and able to raise $1,452,000 directly for her campaign. These new laws were specifically designed to apply to the supreme court election in 2011 when I would be on the ballot.

Early in 2010, I discovered a very different atmosphere from what I had experienced in 2001 when I ran unopposed. There was going to be a major effort to challenge my re-election. This was evident well before Scott Walker was elected governor. This effort was led inside the supreme court by then-Chief Justice Abrahamson and Justice Bradley. It was led outside the court by interests hoping that a new supreme court majority, led by Justice Abrahamson, would take charge of deciding legislative reapportionment.

Three challengers announced their candidacies. Two of these challengers qualified for public funding. All three candidates campaigned in the primary on why I should be replaced.

The primary election was held on February 15, 2011. I received 55 percent of the vote. However, February 15 was the date Governor Walker announced the legislative initiative that became Act 10. This legislation led to massive demonstrations and transformed the campaign to defeat me into a symbolic election against Scott Walker, even though I had no involvement in or prior notice of Governor Walker's proposed legislation.

The Brennan Center for Justice acknowledged that the 2011 race featured "vicious, mudslinging attack ads." Brennan Center for Justice, Buying Time 2011: Judicial Public Financing in Wisconsin, (April 5, 2011), available at http://www.brennancenter.org/analysis/judicial-public-financing-wisconsin-%E2%80%94-2011. Ads of this nature did not emanate from my campaign.

The special prosecutor now contends that because he is investigating "individuals" and "entities" who spent substantial amounts of money responding to attack ads and supporting my re-election, I must recuse myself from his case.

This is not a Caperton case. In Caperton, a single individual (1) contributed $1,000 to the campaign committee of a West Virginia Supreme Court candidate trying to unseat an incumbent, (2) donated $2.5 million to a political action organization formed under 26 U.S.C. § 527 to support the candidate and oppose the incumbent, and (3) spent an additional $500,000 on independent expenditures "to support" the candidate. Caperton, 556 U.S. at 873. The individual, Don Blankenship, was the chairman, chief executive officer, and president of a coal company that had just lost a jury trial in which it was accused of fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations. Id. at 872-73. A jury awarded plaintiff Caperton $50 million in compensatory and punitive damages. This verdict was certain to be appealed to the West Virginia Supreme Court of Appeals on which Blankenship's favored candidate hoped to serve.

July 29, 2015
Page 8

After winning the election, the candidate did serve on the Supreme Court of Appeals, denied a recusal motion, and voted to reverse the $50 million verdict. The vote was 3-2. There were then new procedural moves and the court reconsidered its vote, with two new judges. The candidate at issue again did not recuse himself and again voted, in a 3-2 vote, to reverse the jury verdict.

When the Caperton case was reviewed by the United States Supreme Court, the Court reversed, saying:

> We conclude that there is a serious risk of actual bias——based on objective and reasonable perceptions——when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.

Id. at 884 (emphasis added).

The Court said that the Caperton case addressed "an extraordinary situation where the Constitution requires recusal. . . . The facts now before us are extreme by any measure. The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case." Id. at 887 (emphasis added).

The Court also said:

> The temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is also critical. It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice. The $50 million adverse jury verdict had been entered before the election, and the Supreme Court of Appeals was the next step once the state trial court dealt with post-trial motions. So it became at once apparent that, absent recusal, [the new justice] would review a judgment that cost his biggest donor's company $50 million. Although there is no allegation of a quid pro quo agreement, the fact remains that Blankenship's extraordinary contributions were made at a time when he had a vested interest at stake in the outcome. Just as no man is allowed to be a judge in his own cause, similar fears of bias can arise when——without the consent of the other parties——a man chooses the judge in his own cause.

Id. at 886.

My colleague, Justice Annette Kingsland Ziegler, recently discussed the Caperton decision in State v. Herrmann, 2015 WI 84, ¶¶136-37, ___ Wis. 2d ___, ___ N.W.2d ___ (Ziegler, J., concurring). She wrote:

> The United States Supreme Court concluded that there was a serious risk of Justice Benjamin's actual bias in sitting on Caperton because: (1) the case had been pending since before Justice Benjamin was elected; (2) the jury verdict in

July 29, 2015
Page 9

that case was $50 million; (3) if elected, Justice Benjamin would be sitting on the court that would review this $50 million verdict; (4) Blankenship's extraordinary $3 million expenditures supporting Benjamin dwarfed the amount spent by both campaign committees combined; (5) Blankenship's $3 million expenditures exceeded the expenditures of all other Benjamin supporters combined; and (6) Blankenship's $3 million expenditures had a "significant and disproportionate influence" in helping Benjamin win a close election. See Caperton, 556 U.S. at 883-86. . . .

The Supreme Court made clear that no one factor alone——or anything short of this combination of factors——would have constituted a due process violation so to require recusal. In that regard, the Supreme Court noted that its holding was based on "all the circumstances of [that] case . . . ." Id. at 872. The Court further noted that "[a]pplication of the constitutional standard implicated in [Caperton] will [] be confined to rare instances." Id. at 890.

Here, the circumstances are very different from Caperton.

First, there was no "pending or imminent" case against any individual or entity who made expenditures in the 2011 election at the time the expenditures were made. Although one organization whose affiliate made expenditures occasionally appears before the Wisconsin Supreme Court as amicus curiae, there was no likelihood that this organization would be a party in litigation before the court in the foreseeable future.

Second, unlike the candidate in West Virginia, I had been a member of our court for almost 13 years before the expenditures were made.

Third, unlike West Virginia, Wisconsin has no procedure to replace a justice who withdraws from a case as a result of a recusal motion. Successful recusal motions alter the composition of the Wisconsin Supreme Court, so that, in a very real sense, a party moving for a justice's recusal is trying to change the composition of the court that will hear its case.

Fourth, although several large expenditures were made to support my candidacy in the 2011 election, the Wisconsin Legislature made this result inevitable when it limited the total amount of contributions to my campaign committee to $20,000. There were approximately 2,000 contributors to my campaign, but most of the contributions were between $5 and $10. There were no contributions of $1,000. Total expenditures by my committee in the primary and general elections were $420,000, of which $400,000 consisted of public grants. My opponents received $500,000 in public grants.

Well over a million dollars was spent by third parties on issue advocacy distorting or misrepresenting my record. Wisconsin law provided no practical means for my committee to respond to the misrepresentations because I participated in a publicly funded campaign. These misrepresentations were made in the context of substantial hostility to Governor Walker over issues in which I had no part, and they were made in the context of the organization of the

potential recall of eight Republican state senators, which provided invaluable information to campaign operatives seeking to get out the vote of particular people likely to vote against me.

Thus, while it can be argued that independent communications supporting my campaign were "significant and disproportionate," there was no alternative under Wisconsin law for people who believed I had done a good job and wanted me to continue. Statistics can be very misleading. For instance, even a $100,000 independent communication would have been "five times what all of Prosser's contributors gave to his campaign and more than 200 times the amount received from his largest contributor." Such statistics are meaningless in the context of the 2011 supreme court election. What should be understood is that the election generated the largest turnout of any supreme court election in Wisconsin history.

Fifth, although parties in litigation are entitled to judges who are impartial, due process claims against judges are normally not asserted by the State. When private individuals and organizations are defendants in an action by the State, the defendants may assert due process claims concerning the alleged bias of a judge. However, it is virtually unprecedented for the State to assert such claims. This is why the State has no authority to substitute against a judge in circuit court under Wis. Stat. § 971.20. The principle is well illustrated in the landmark case of Tumey v. Ohio, 273 U.S. 510, 532 (1927), where the Court said:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.

Caperton, 556 U.S. at 878 (citing Tumey, 273 U.S. at 532) (emphasis added).

Finally, the expenditures at issue in the special prosecutor's motion were made in 2011. It is now 2015, four years later. Unless the expenditures made in 2011 are viewed as a lifetime ban on my participation in cases involving the organizations that made the expenditures in 2011, I believe that sufficient time has passed since the expenditures and the present case that my recusal is not required.

IV

The special prosecutor articulates additional specific concerns that he believes should disqualify me from participation in the John Doe cases. I do not agree.

First, he asserts that my campaign treasurer also serves as the campaign treasurer for one of the many targets of his investigation. This is mostly coincidence. The treasurer filed an affidavit with the court that explains that she has served as a treasurer or bookkeeper for 25-30 political candidates. "My work has never involved any strategy, political or otherwise, with respect to any of these candidates," she writes.

Although I have spoken occasionally with my campaign treasurer by telephone, I do not recall ever meeting her in person. She is a professional who performs ministerial duties with

respect to multiple campaigns. My campaign treasurer was never a target of the investigation and thus I do not see any conflict in my sitting in the John Doe cases because of her.

Second, the special prosecutor alleges that two of the unnamed petitioners "were actively involved in the Justice Prosser re-election campaign, as exemplified by a November 17, 2010 email." The email reads in pertinent part: "We need to do a quick conference call at 2PM tomorrow to discuss the Prosser race and his need for 1,000 low dollar donors by year end."

This email was sent before my campaign manager was hired. In due course, my campaign sent out many letters and emails asking for low-dollar contributions, which had to be received within a limited period of time to qualify for a public grant. Countless people involved in the novel 2011 supreme court election understood the importance of securing a large number of small donors, and many people helped because failure to secure the requisite number of small donations would have doomed the campaign. The truth of this assessment was proven by the candidate who failed to qualify for public funding. She had no money for television and her candidacy did not survive the primary.

One of the Unnamed Petitioners is quoted in another email about raising money for a campaign "to maintain the Court." This and another quoted email are little more than evidence of the fact that some targets of the investigation (who had participated in other campaigns for the supreme court) engaged in expenditures that, under all the circumstances, were very valuable to my campaign.

The special prosecutor does not contend that there was any impropriety in these third party campaign activities, only that because I received support from groups that came under his investigation, I must not participate in a review of the investigation.

The public ultimately decides at the ballot box who is permitted to serve on the Wisconsin Supreme Court. The special prosecutor seeks to prevent an elected justice from performing that service unless the unelected special prosecutor wants the elected justice to sit on the case. This is not the way the system works.

Third, the special prosecutor cites an email from my volunteer campaign coordinator in Waukesha County to a staff member in Governor Walker's office. As an addendum to the email, the volunteer wrote:

> NOTE: Justice Prosser sent a letter to me and I thought you may wish to forward it if appropriate. I needed to get very creative with diverse state and National organizations to help his campaign due to being capped at $300,000 and it was a non-partisan race without the benefit of normal political party help which was very different than working with Governor Walker's team. Justice Prosser is an experienced Justice on our Supreme Court and a pleasure to work with.

The volunteer attached a letter I had written to him thanking him for his efforts.

July 29, 2015
Page 12

My letter referenced "the exceptional commitment of literally hundreds and hundreds of people across Wisconsin." If we had had a more stable financial operation, I would have sent out many, many, many letters of thanks——to election volunteers, recount volunteers, and recount contributors.

This volunteer asked for a letter of recommendation. Since he was not a hired employee and I had met him only once or twice, I thought it safer to send him a warm letter of thanks. Although I had no reason to doubt excellent work on his part, I frankly did not know what he had done. The letter repeats what he said he had done. I have no knowledge that this volunteer raised any money. If he did, any such money did not and could not pass through my campaign committee, and any fundraising was not directed by my campaign manager.

Finally, the special prosecutor alleges the "close connection of Justice Prosser's campaign with Governor Walker's administrative team" because my campaign manager issued a news release in December 2010 announcing his appointment and adding the comment that "our campaign will include building an organization that will return Justice Prosser to the bench, protecting the conservative judicial majority and acting as a common sense compliment [sic] to both the new administration (Governor Walker) and Legislature."

This news release should not have been issued as written. The problem for the special prosecutor is that this news release was put out without my knowledge or approval, and the fact that I had not approved the news release and did not agree with the objectionable statement has been widely reported. See, e.g., Jason Stein and Patrick Marley, More Than They Bargained For 245 (2013). Consequently, the special prosecutor is relying on information that is taken out of context and incomplete.

These four concerns add nothing of substance to the indisputable fact that several groups supported my campaign in 2011 with substantial spending on independent communications. If my recusal were required now because of these expenditures——that is, four years after lawful independent communications were made to support my candidacy when there was no other practical way to support that candidacy and answer the virulent personal attacks on my integrity——the special prosecutor will have found a way to undermine judicial elections in Wisconsin.

I would, of course, have preferred to run for re-election without opposition as I did in 2001. I would have preferred to run without controversy. I am very proud, however, to have received more votes than any judge in a contested election in Wisconsin history, to have participated in a unique publicly funded campaign, and to have engaged in 11 different debates with my opponents during that campaign. The people of Wisconsin knew who they were voting for. The special prosecutor should be expected to live with the results.

For the reasons stated, the special prosecutor's motion is denied.